86 P.3d 982

Albert MORGAN, Sr., Robert Hansen,
Alex Ferreira, M.D. and Clifford
Bond, Appellants–Appellees

v.

PLANNING DEPARTMENT, COUNTY
OF KAUAI, Appellee–Appellant

Dennis Badagliaco, Respondent,

Planning Commission, County of Kauai, Randal Nishimura, in his capacity as Chairman of the Planning Commission, County of Kauai; Sandi Kato–Klutke, in her capacity as Commissioner of the Planning Commission, County of Kauai; Abigail Santos, in her capacity as Commissioner of the Planning Commission, County of Kauai; Theodore Daligdig III, in his capacity as Commissioner of the Planning Commission, County of Kauai; Michael Crockett, in his capacity as Commissioner of the Planning Commission, County of Kauai; Steven Weinstein, in his capacity as Commissioner of the Planning Commission, County of Kauai, Lawrence Chaffin, Jr., in his capacity as Commissioner of the Planning Commission, County of Kauai; Planning Department, County of Kauai, Appellees–Appellants,[1]

Carol Lemke and Buddy Lizama,
Intervenors–Appellees.

No. 22709.

Supreme Court of Hawai'i.

March 24, 2004.

1. The parties have been substituted pursuant to HRAP Rule 43(c)(1).

Blaine J. Kobayashi, Deputy County Attorney, on the briefs, for appellees-appellants Planning Department, County of Kauai and Planning Commission, County of Kauai.

Benjamin A. Kudo, Wesley M. Fujimoto, and Stacy E. Uehara, Honolulu, on the briefs, for appellants-appellees Albert Morgan, Sr., Robert Hansen, Alex Ferreira, M.D., and Clifford Bond.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

Appellees-appellants Planning Department, County of Kauai (Planning Department), and Planning Commission, County of Kauai (Planning Commission), appeal from the June 30, 1999 decision and order of the circuit court of the fifth circuit, the Honorable Clifford L. Nakea presiding, reversing the July 24, 1997 decision and order of the Planning Commission, which (1) modified condition no. 6 of appellants-appellees Albert Morgan, Sr., Robert Hansen, Alex Ferreira,

M.D., and Clifford Bond's [hereinafter, collectively, "Morgan"] Special Management Area (SMA) Use permit and (2) ordered Morgan to alter and repair the seawall and conduct a sand replenishment program. On appeal, the Planning Department and Planning Commission argue that the circuit court erred, as a matter of law, in ruling that the Planning Commission did not have authority to: (1) modify condition no. 6 of Morgan's SMA Use permit, inasmuch as Hawai'i Revised Statutes (HRS) § 205A–29 (2001)[2] does not preclude the Planning Commission from acting to revoke, amend, or modify a validly issued SMA Use permit; and (2) order injunctive relief, inasmuch as HRS §§ 205A–33 (2001)[3] and 205A–29 authorize the Planning Commission to order corrective action for SMA Use permit violations.

We hold that the Planning Commission had authority to modify a validly issued SMA Use permit, inasmuch as the Planning Commission is statutorily mandated to give effect to the policies and objectives of the Coastal Zone Management Act (CZMA). Reading HRS § 205A–29 in conjunction with condition no. 6 and the Planning Commission's Rules of Practice and Procedure (PCRPP), as well as in the context of the entire CZMA, and construing it in a manner consistent with the CZMA's policies and objectives, the words "final unless otherwise mandated by court order" does not preclude modifications of a SMA Use permit at a later date for changed conditions. We further hold, however, that, inasmuch as the CZMA expressly and unambiguously grants injunctive power to the circuit court pursuant to the plain language of HRS § 205A–33, the Planning Commission lacked authority to issue injunctive relief on its own. Notwithstanding, based on the record, that part of the Planning Commission's decision and order ordering Morgan to (1) alter the southern portion of the seawall to provide a sloped, curved return rock revetment, and (2) repair the seawall and the areas immediately mauka of it, was not in the nature of an injunction, inasmuch as they were not equitable remedies, but, rather, operated to ensure compliance with the terms and conditions of the SMA Use permit, as originally issued. Accordingly, HRS § 205A–33 was not implicated in those respects. In addition, the Planning Commission was authorized to revoke, amend, or modify the SMA Use permit or allow Morgan a reasonable opportunity to correct, remedy, or rectify the wrongs caused by Morgan's noncompliance. On the other hand, by ordering Morgan to conduct a sand replenishment program, the Planning Commission improperly attempted to mandate injunctive relief. Accordingly, we affirm in part and reverse in part the circuit court's decision and order reversing the Planning Commission's July 24, 1997 decision and order.

## I. BACKGROUND

On September 2, 1981, Emmett Oehlert (Oehlert) applied for a SMA Use permit with

2. HRS § 205A–29 provides:
 (a) The authority in each county, upon consultation with the central coordinating agency, shall adopt rules under chapter 91 setting the special management area use permit application procedures, conditions under which hearings must be held, and the time periods within which the hearing and action for special management area use permits shall occur. The authority shall provide for adequate notice to individuals whose property rights may be adversely affected and to persons who have requested in writing to be notified of special management area use permit hearings or applications. The authority shall also provide public notice statewide at least twenty days in advance of the hearing. The authority may require a reasonable filing fee which shall be used for the purposes set forth herein.
 Any rule adopted by the authority shall be consistent with the objectives, policies, and special management area guidelines provided in this chapter. Action on the special management permit shall be final unless otherwise mandated by court order.
 (b) No agency authorized to issue permits pertaining to any development within the special management area shall authorize any development unless approval is first received in accordance with the procedures adopted pursuant to this part. For the purposes of this subsection, county general plan, state land use district boundary amendments, and zoning changes are not permits.

3. HRS § 205A–33 provides that "[a]ny person or agency violating any provision of this chapter may be enjoined by the circuit court of the State by mandatory or restraining order necessary or proper to effectuate the purposes of this chapter in a suit brought by the authority or the lead agency."

the Planning Department on behalf of himself and his neighbors, Albert Morgan, Ulfert Wilke (Wilke) and Alex Ferreira (Ferreira), to construct a seawall in an effort to protect their properties from the potentially damaging shoreline erosion that occurred over the past decade. One month later, on October 28, 1981, the Planning Commission held a public hearing on Oehlert's request and, subsequently, granted him a SMA Use permit. The SMA Use permit approved the construction of a rock revetment,[4] subject to nine conditions.[5]

Five years later, in 1986, Elsa Holtwick (Holtwick), a property owner neighboring the seawall, filed a civil lawsuit against Oehlert, Doris I. Oehlert, Ferreira, Marietta L. Ferreira, Wilke, Dorothy K. Wilke, Albert S. Morgan, and Helen S. Morgan [hereinafter, collectively, "the seawall owners"], alleging that the negligent construction and maintenance of the seawall damaged her property. On September 17, 1991, the circuit court of the fifth circuit, the Honorable Clifford L. Nakea presiding, entered judgment in favor of Holtwick and ordered the seawall owners to pay her $128,000.00.

On August 31, 1995, Joseph Lizama (Lizama), a property owner south of the seawall, wrote a letter to Michael Wilson, the Chairman and Director of the State Board of Land and Natural Resources, expressing his concern about the erosion of his property since the seawall was erected. Seven months later, on March 5, 1996, Carol Lemke (Ms. Lemke) and her husband, Paul D. Lemke [hereinafter, collectively, "the Lemkes"], property owners who also reside south of the seawall, wrote letters to the Planning Commission regarding the damage to their property caused by the seawall and urged them to take action.

Consequently, on May 2, 1996, at the request of Lizama and the Lemkes, the Planning Department filed a petition with the Planning Director of the County of Kauai to initiate proceedings to revoke, amend, or modify the SMA Use permit. The petition specifically alleged that: (1) the seawall was not constructed according to approved plans; (2) the seawall owners failed to obtain permits for additional development in connection with the permitted project; and (3) the seawall owners failed to comply with the conditions of the SMA Use permit's approval. On

4. The Planning Commission's "General Factual Findings" defined a rock revetment as:
 a loose stack of rocks consisting of individual rocks or boulders stacked in a sloping configuration against the cliff, bluff, or dune. The rocks may be of different size, may slope at somewhat different angles, may extend from different depths to different heights, may be layered and underlain by geofabric or filter cloth. A rock revetment has a larger footprint than vertical seawalls.

5. The nine conditions placed on the SMA Use permit were as follows:
 1. No permit shall be approved until the certified shoreline survey confirmed by the Chairman of the Board of Land and Natural Resources is submitted.
 2. The entire rock revetment shall be constructed totally mauka of the certified shoreline or, as recommended by the State Department of Land and Natural Resources, should it be constructed seaward of the certified shoreline, a State Conservation District Use Application must be filed and disposition of land rights will be necessary.
 3. No sand from makai of the certified shoreline shall be removed or used for construction of the revetment.

4. No other structures shall be constructed within the shoreline setback area.
5. Lateral access along the shoreline shall be provided by the applicant when lateral beach access is blocked by the revetment.
6. The revetment shall be modified as determined and recommended by the applicant's engineer at the applicant's expense should it be determined to be the cause of significant adverse environmental effects to the shoreline and Special Management Area.
7. The applicant shall execute a waiver and indemnity agreement with the County absolving the County from any liabilities due to adverse impacts caused by the subject revetment.
8. The applicant shall obtain sufficient insurance to provide adequate compensation to those affected landowners whose properties are proven to be adversely impacted by the construction of the revetment.
9. The applicant is advised that prior to and/or during construction, additional government agency conditions may be imposed. It shall be the applicant's responsibility to resolve those conditions with the respective agency(ies).

July 24, 1997, after several public hearings, the Planning Commission issued its findings of fact, conclusions of law, decision and order [hereinafter, "the Commission decision"], concluding that the seawall was not built according to the plan approved by the Planning Commission when it issued the SMA Use permit, and various conditions of the SMA Use permit were violated. Thereafter, the Planning Commission modified condition no. 6 of the SMA Use permit as follows:

> IT IS FURTHER ORDERED that Condition No. 6 be modified in the following manner:
>> The revetment shall be modified as determined and recommended by the [applicant's engineer] Planning Commission at the applicant's expense should it be determined to be the cause of significant adverse environmental effects to the shoreline and Special Management Area.
> Bracketed portions to be deleted. Underscored portions to be added.

The Planning Commission further ordered Morgan, in lieu of removing the seawall, to (1) conduct a sand replenishment program for the area immediately fronting the seawall, (2) alter the southern portion of the seawall to limit flanking erosion by providing a sloped, curved return rock revetment, (3) offer Ms. Lemke and Lizama a one-time sand replenishment program for the area immediately fronting their properties, and (4) repair the seawall and its surrounding areas.

On August 29, 1997, Morgan appealed the Commission decision to the circuit court. Morgan argued, *inter alia*,[6] that the Planning Commission lacked authority to (1) reopen a valid SMA Use permit issued over fifteen years ago, (2) order injunctive relief by requiring Morgan to conduct a sand replenishment program on property that does not belong to them, (3) order the Planning Commission to pre-approve all necessary repairs to the seawall, and (4) retrospectively apply its administrative rule enacted in 1992.

**6.** On appeal to the circuit court, Morgan also argued that: (1) the Planning Commission erred by failing to find that the Planning Department's claims were time-barred under the doctrine of laches and/or the statute of limitations; (2) the Planning Department failed to satisfy, by a preponderance of evidence, that Morgan failed to

In response, the Planning Department and Planning Commission maintained that they had authority to order sand replenishment and impose reasonable conditions on the development, pursuant to HRS chapter 205A. The circuit court, however, held that the Planning Commission lacked authority to: (1) modify condition no. 6 of the SMA Use permit, inasmuch as the modification conflicted with HRS § 205A–29; and (2) order injunctive relief, inasmuch as requiring Morgan to modify, alter, and repair the seawall violated HRS §§ 205A–33 and 205A–29. Specifically, the circuit court's decision provided, in relevant part, as follows:

> The Decision and Order portion of [the Commission decision] mandates that [Morgan]: (1) remove the seawall; or (2)(a) conduct a properly permitted, perpetual sand replenishment program for the area immediately fronting the seawall; (b) alter the southern portion of the seawall to provide a sloped, curved return rock revetment; (c) conduct a one-time sand replenishment program for the area immediately fronting [Lizama's and Ms. Lemke's] properties; and (3) repair the seawall and the areas immediately mauka of the seawall. Such relief is injunctive in nature.

> The Commission and Department argued on appeal that the Commission is empowered to order such relief, pursuant to Chapter 12 of the Commission's Rules [Revocation and Modification of Permits], specifically, rules 1–12–8(b) and 1–12–9(b). Planning Commission Rule 1–12–8(b) [Decision on Petition] provides in relevant part that:
>> If the Commission finds that any term or condition of a permit has been violated or not complied with, the Commission may revoke, amend or modify the permit or may allow the permit holder a reasonable opportunity to correct, remedy or rectify the violation.

comply with the terms and conditions of the SMA Use permit; and (3) the Planning Commission's order violated state and federal constitutional protections. These arguments, however, are not pertinent to the instant matter, and, therefore, will not be discussed.

Rule 1–12–9(b) [Modification or Deletion of Conditions] provides that, "For good cause shown, the Commission may act to modify or delete any of the conditions imposed."

However, HRS § 205A–33 [Injunctions] of the Coastal Zone Management Act provides:

> Any person or agency violating any provision of this chapter may be enjoined *by the circuit court of the State* by mandatory or restraining order necessary or proper to effectuate the purposes of this chapter in a suit brought by the authority or lead agency (emphasis added).

Also, HRS § 205A–29 [Special management area use permit procedure] provides in relevant part that, "... Any rule adopted by the authority shall be consistent with the objectives, policies, and special management area guidelines provided in this chapter ..." Finally, an administrative agency's rules may not enlarge, alter, or restrict the provisions of the statute being administered. *Topliss v. The Planning Commission*, 9 Haw.App. 377, 931–2 [391–2] [n. 11], [842 P.2d 648, 657 n. 11] (1993); *Jacober v. Sunn*, 6 Haw.App. 160, 167[, 715 P.2d 813, 819] (1986). Although the court's duty is to ascertain and effectuate the intent of the administrative agency, and administrative rules must be read to give them effect, to the extent that Rules 1–12–8(b) and 1–12–9(b) of the Commission's Rules are interpreted to authorize the Commission to order injunctive relief for permits governed by HRS Chapter 205A, they conflict with the relevant portions of HRS § 205A–33 and HRS § 205A–29 cited above. *Topliss*, 9 Haw. App. at 391–2 [n. 11], [842 P.2d at 657 n. 11]. Therefore, this court finds that the Commission was not empowered to order the injunctive relief that it ordered in the Decision and Order portion of [the Commission's decision]. By ordering [Morgan] to remove the seawall, or modify it, replenish sand, and repair it and the areas immediately mauka of it, the Commission improperly attempted to mandate injunctive relief in violation of statutory provision, specifically, HRS § 205A–33 and § 205A–29.

. . . .

The Commission ordered that Condition No. 6 of the SMA Use [p]ermit be modified as follows:

> The revetment shall be modified as determined and recommended by the [applicant's engineer] Planning Commission at the applicant's expense should it be determined to be the cause of significant adverse environmental effects to the shoreline and [SMA].

> Bracketed portions deleted. Underscored portions to be added. . . .

HRS § 205A–29 provides in relevant part that, "Action on the [SMA Use] permit shall be final unless otherwise mandated by court order." Therefore, to the extent that the Commission's Rules 1–12–8(b) and 1–12–9(b) are interpreted to authorize the Planning Commission ... to modify the conditions listed in [Morgan's] SMA Use [p]ermit, issued on October 28, 1981, they conflict with the relevant portion of HRS § 205A–29 cited above. Finally, even if the Commission's rules 1–12–8(b) and 1–12–9(b), as interpreted to authorize the Commission to modify the October 28, 1981 SMA Use [p]ermit ... do not conflict with the relevant portion of HRS § 205A–29, applying those rules, which became effective on November 6, 1992, to the October 28, 1981 SMA Use [p]ermit constitutes the retrospective application of law. *Clark v. Cassidy*, 64 Haw. 74, 77 [n. 6, 636 P.2d 1344, 1346 n. 6] (1981); *Bowers v. Alamo Rent-[A]-Car, [Inc.]*, 88 Hawai'i 274, 281[, 965 P.2d 1274, 1281] (1998).

(some brackets in the original). The Planning Department and Planning Commission filed a timely notice of appeal.[7]

---

7. The Planning Department and Planning Commission's notice of appeal was prematurely filed on July 28, 1999, after entry of the circuit court's June 30, 1999 decision and order, but before entry of the August 11, 1999 final judgment. However, because the final judgment was entered by the time the record was filed in this court on September 7, 1999, the Planning Department's and Planning Commission's notice of appeal is treated as filed on August 11, 1999, and, therefore, is a timely appeal from the August 11, 1999 judgment. Hawai'i Rules of Appellate

## II. STANDARD OF REVIEW

### A. Administrative Agency Decision

It is well-established that decisions of administrative agencies acting within the realm of their expertise are accorded a presumption of validity, and, therefore, the appellant carries a heavy burden of convincing the court that the decision is invalid because it is unjust and unreasonable in its consequences. *Ka Pa'akai O Ka'Aina v. Land Use Comm'n, State of Hawai'i*, 94 Hawai'i 31, 40, 7 P.3d 1068, 1077 (2000) (citations omitted); *see also Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan*, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998). As such,

> [r]eview of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

*Ka Pa'akai O Ka'Aina*, 94 Hawai'i at 40, 7 P.3d at 1077 (citations omitted).

HRS § 91–14(g) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Procedure (HRAP) Rule 4(a)(2); *see also Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i

HRS § 91–14(g). Accordingly, pursuant to the statutory provisions of HRS § 91–14(g), an agency's "conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Sullivan*, 87 Hawai'i at 229, 953 P.2d at 1327 (quoting *Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 305, 916 P.2d 1203, 1206 (1996)). More specifically, under HRS § 91–14(g),

> [a]n agency's findings of fact are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. An agency's conclusions of law are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.

*Ka Pa'akai O Ka'Aina*, 94 Hawai'i at 41, 7 P.3d at 1078 (citations and internal quotation marks omitted).

### B. Statutory Interpretation

"The interpretation of a statute is a question of law that is reviewed de novo." *State v. Mara*, 98 Hawai'i 1, 10, 41 P.3d 157, 166 (2002) (citation omitted).

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be

115, 120, 869 P.2d 1334, 1339 (1994).

sought by examining the context with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Sullivan*, 97 Hawai'i 259, 262, 36 P.3d 803, 806 (2001) (citations and internal quotation marks omitted).

Although judicial deference to agency expertise is generally accorded where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are subject to review, this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. Furthermore, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

*Ka Pa'akai O Ka'Aina*, 94 Hawai'i at 41, 7 P.3d at 1078 (citations, internal quotation marks, and brackets omitted).

## III. DISCUSSION

### A. Because the issues raised by the Planning Department and Planning Commission are of great importance to this community, we address the merits of the issues raised, notwithstanding a technical violation of Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).

As a preliminary matter, we note that the Planning Department and Planning Commission's opening brief fails to comply with the requirements set forth in Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (2002),[8] inasmuch as the Planning Department and Planning Commission failed to cite where in the record they objected to the circuit court's alleged error in their "Statement of Points of Error" section of their opening brief. Indeed, it is well settled that failure to comply with HRAP Rule 28(b)(4) is alone sufficient to affirm the circuit court's judgment. *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 235, 948 P.2d 1055, 1076 (1997); *O'Connor v. Diocese of Honolulu*, 77 Hawai'i 383, 385, 885 P.2d 361, 363 (1994); *see also Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 420, 32 P.3d 52, 64 (2001) (recognizing that non-compliance with HRAP Rule 28(b)(4) "offers sufficient grounds for the dismissal of the appeal"). This court, however, has consistently adhered to the policy of

8. HRAP Rule 28(b)(4) provides:

Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing the following sections in order here indicated:

A concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. · Where applicable, each point shall also include the following:

(A) when the point involves the admission or rejection of evidence, a quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected;

(B) when the point involves a jury instruction, a quotation of the instruction, given, refused, or modified, together with the objection urged at the trial;

(C) when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error;

(D) when the point involves a ruling upon the report of a master, a quotation of the objection to the report.

Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented. Lengthy parts of the transcripts that are material to the points presented may be included in the appendix instead of being quoted in the point.

affording litigants the opportunity "to have their cases heard on the merits, where possible." *O'Connor*, 77 Hawai'i at 386, 885 P.2d at 364 (citations omitted). Inasmuch as Hawai'i constitutionally recognizes the significance of conserving and protecting Hawai'i's natural beauty and all natural resources for present and future generations, the seawall and its effect on Kaua'i's coastline and neighboring properties is of great importance to the people of Hawai'i. Haw. Const. art. XI, § 1. Accordingly, because the issues raised in the instant case are of great importance, we address the merits of the issues raised by the Planning Department and Planning Commission, notwithstanding the technical violation of HRAP Rule 28(b)(4).

**B. The circuit court erred in holding that the Planning Commission lacked authority to modify condition no. 6 of Morgan's SMA Use permit, inasmuch as the Planning Commission is statutorily mandated to give effect to the policies and objectives of the CZMA.**

■ The Planning Department and Planning Commission argue that the circuit court erred, as a matter of law, in concluding that the Planning Commission lacked authority to modify condition no. 6 of Morgan's SMA Use permit. Specifically, the Planning Department and Planning Commission maintain that, notwithstanding the circuit court's literal construction of HRS § 205A–29, the Planning Commission has both the implied and inherent authority to enforce the conditions of a SMA Use permit, which entails revoking, amending, or modifying the SMA Use permit. The Planning Department and Planning Commission further argue, in the alternative, that, because the circuit court's interpretation of the "finality" language of HRS § 205A–29 would lead to absurd results, inasmuch as the Planning Department and Planning Commission would need to file a court action each time a SMA Use permit needs modification, their inherent authority to reconsider their own decisions would be affected. Finally, the Planning Department and Planning Commission contend that, because the Planning Commission is vested with broad power and authority to carry out the policies and objectives of the CZMA, the

Planning Commission has continuing jurisdiction over SMA Use permits to ensure compliance with the CZMA.

Because the Planning Commission is statutorily mandated to give effect to the policies and objectives of the CZMA, the Planning Commission has authority to reconsider and the implied authority to modify a validly issued SMA Use permit. Moreover, this court will not permit an interpretation of HRS § 205A–29 that produces an absurd result. Furthermore, the plain language of the Planning Commission's Rules of Practice and Procedure authorizing revocation and modification reveals the extent of the Planning Commission's authority. Accordingly, the circuit court erred in holding that the Planning Commission lacked authority to modify condition no. 6 of Morgan's SMA Use permit.

1. *The CZMA embodies the State's declared policy of preserving, protecting, and, where possible, restoring the natural resources of Hawai'i's coastal zone.*

■ "The CZMA is a comprehensive State regulatory scheme to protect the environment and resources of our shoreline areas." *Topliss v. Planning Comm'n,* 9 Haw.App. 377, 384, 842 P.2d 648, 654 (1993) (citing *Mahuiki v. Planning Comm'n,* 65 Haw. 506, 517, 654 P.2d 874, 881 (1982)) (internal quotation marks omitted); *see also* HRS ch. 205A. When the Hawai'i legislature enacted the CZMA, it specifically found that

special controls on developments within an area along the shoreline are necessary to avoid permanent losses of valuable resources and the foreclosure of management options, and to ensure that adequate access, by dedication or other means, to public owned or used beaches, recreation areas, and natural reserves is provided. The legislature therefore declared it to be the state policy to preserve, protect, and where possible, to restore the natural resources of the coastal zone of Hawai'i. In order to carry out the CZMA's policies and objectives, the legislature authorized the counties to establish SMAs. Development within an SMA is controlled by a permit

system administered by the counties pursuant to HRS § 205A–28.

*Topliss,* 9 Haw.App. at 385, 842 P.2d at 654 (citations and internal quotation marks omitted). Accordingly, in order to preserve, protect, and, where possible, restore the natural resources of Hawai'i's coastal zone, the CZMA imposes special controls on the development of real property along the shoreline areas and delegated to the counties the responsibility of implementing the State's policy embodied in the CZMA through the administration of SMA Use permits. HRS § 205A–21 (2001); [9] *see also* HRS § 205A–27 (2001) ("The authority is designated the special management area authority and is authorized to carry out the objectives, policies and procedures of this part."); HRS § 205A–28 (2001) ("No development shall be allowed in any county within the special management area without obtaining a permit in accordance with this part."); *Topliss,* 9 Haw.App. at 384–85, 842 P.2d at 654; *Sandy Beach Defense Fund v. City Council of City and County of Honolulu,* 70 Haw. 361, 365, 773 P.2d 250, 254 (1989). Among the CZMA's stated objectives and policies are "[p]rotect[ing] beaches for public use and recreation" and "[p]rovid[ing] adequate, accessible, and diverse recreational opportunities in the coastal zone management area by ... [r]equiring replacement of coastal resources having significant recreational value including, but not limited to ... sand beaches, when such resources will be unavoidably damaged by development[.]" HRS §§ 205A–2(b)(9)(A) and 205A–2(c)(1)(B)(ii) (2001). In order to protect and preserve Hawai'i's beaches, the CZMA mandates that the designated authority "seek to minimize, where reasonable ... [a]ny development which would reduce the size of any beach or other area usable for public recreation." HRS

§ 205A–26(3)(B) (2001). As such, the designated authority is required to implement these objectives and policies through its administrative rules and SMA Use permit procedure. *See generally* HRS § 205A–29.

> a. *In carrying out the CZMA's mandate, the Planning Commission has authority to reconsider a validly issued SMA Use permit.*

The Planning Commission has authority to reconsider a validly issued SMA Use permit, inasmuch as the Planning Commission's enabling statute requires that the Planning Commission carry out the policies and objectives of the CZMA and ensure its compliance. In order to effectively minimize any development that would reduce the size of any beach or public recreation area, the Planning Commission must maintain its jurisdiction over validly issued SMA Use permits. As such, Morgan's reliance on *Yamada v. Natural Disaster Claims Comm'n,* 54 Haw. 621, 513 P.2d 1001 (1973), is misplaced.

In *Yamada,* this court was asked to decide whether the determination of losses by the 1961 Natural Disaster Claims Commission [hereinafter, "First Commission"] was final, and, thus, precluded the 1965 Natural Disaster Claims Commission [hereinafter, "Second Commission"] [10] from recertifying losses. *Yamada,* 54 Haw. at 624, 513 P.2d at 1003–1004. Holding that "a statutory basis is necessary for an administrative body to initiate reconsideration of its prior final quasi-judicial decisions" and, because HRS § 234–4 provided for reconsideration only at the claimant's request, the First Commission's decision was final, this court explained that

> [w]hen statutes are silent and legislative intent unclear, agencies and reviewing courts must work out the practices and the

9. HRS § 205A–21 provides:

> The legislature finds that, special controls on development within an area along the shoreline are necessary to avoid permanent losses of valuable resources and the foreclosure of management options, and to ensure that adequate access, by dedication or other means, to public owned or used beaches, recreation areas, and natural reserves is provided. The legislature finds and declares that *it is the state policy to preserve, protect, and where possible, to restore*

> the natural resources of the coastal zone of Hawai'i.
>
> (Emphasis added.)

10. In 1961, the Hawai'i legislature created a Natural Disaster Claims Commission to determine the value of property destroyed by a volcanic eruption and a tsunami. *Yamada,* 54 Haw. at 622–23, 513 P.2d at 1003. In 1965, following the resignation of the original Commission members, the governor appointed a second group of commissioners. *Id.* at 623, 513 P.2d at 1003.

limits on reopening. The considerations affecting reopening to take account of new development or of new evidence of old developments often differ from those affecting the correction of mistakes or shifts in judgment about law or policy. Usually the search for a basic principle to guide reopening is futile; the results usually must reflect the needs that are unique to each administrative task. Factors to be weighed are the advantages of repose, the desire for stability, the importance of administrative freedom to reformulate policy, the extent of party reliance upon the first decision, the degree of care or haste in making the earlier decision, [and] the general equities of each problem.

*Id.* at 625–26, 513 P.2d at 1004–05. As such, this court held that the Second Commission lacked authority to recertify losses, inasmuch as there was no statutory basis for reconsideration and two and one-half years was not a reasonable time in which to recertify. *Id.* at 624–26, 513 P.2d at 1004–05. Chief Justice Richardson dissented in *Yamada.* Chief Justice Richardson opined that "administrative tribunals possess the inherent power of reconsideration of their judicial acts." *Id.* at 631, 513 P.2d at 1007 (Richardson, C.J., dissenting). Relying on the logic expressed by the New York courts for guidance, Chief Justice Richardson noted that, "New York courts have balanced such consideration against the grave consequences that might follow if a decision once made were to be considered beyond recall or the public interest and the supervisory nature of the administrative agency's powers which warranted the finding of an implied power to reconsider." *Id.* at 632, 513 P.2d at 1008 (citations and internal quotation marks omitted). He further noted that, as such, "these courts have found an implied power to reconsider absent express statutory grant or denial of such power where the latter considerations prevail." *Id.* Today, we now adopt the analysis of Chief Justice Richardson's dissent as valid and adhere to its rationale.

The Planning Commission's enabling statute is devoid of any express provision regarding reconsideration. Instead, HRS ch. 205A delegates to the Planning Commission the authority to issue SMA Use permits and ensure compliance with the CZMA's policies and objectives to protect the environment and natural resources of Hawai'i's shoreline areas. In the instant case, the Planning Commission was not aware of the consequences of the seawall on neighboring properties and its natural effects at the time it issued Morgan the SMA Use permit. Specifically, it wasn't until 1986 that the Planning Commission learned that the seawall caused significant environmental damage to the shoreline area. Moreover, Morgan failed to comply with the conditions of the SMA Use permit, inasmuch as Morgan built a seawall, instead of a rock revetment, and, later, made improper and unpermitted additions to the seawall. Experts further testified that the seawall caused significant adverse environmental effects to the shoreline area and led to an increased rate of erosion and loss of beach fronting the seawall.[11] Indeed, at the

---

11. The Planning Commission's Findings of Fact provided in relevant part:

 103. Dr. Charles Fletcher, Associate Professor of Marine Geology and Geophysics with the University of Hawai'i Manoa, testified that the seawall has caused significant adverse environmental effects to the shoreline and SMA of Aliomanu Bay, specifically, the seawall has led to an increased rate of erosion to the shoreline south of the seawall and further, that the seawall has led to the loss of beach fronting the seawall.

 104. As to the erosion rate of the beach, Dr. Fletcher testified that prior to the construction of the seawall, the beach south of the seawall experienced negligible rates of change. However, after the seawall was constructed, the beach to the south of the seawall experienced erosion rates which reached as high as 11.8 feet/year.

 105. As to the erosion rate of the vegetation line, Dr. Fletcher testified that prior to the construction of the seawall, the vegetation line south of the seawall was stable. However, after the seawall was constructed, the vegetation line experienced erosion rates which reached as high as 10 feet/year. Dr. Fletcher states that this erosion rate is the highest coastal erosion rate in the State of Hawai'i.

 106. Dr. Fletcher testified that the existence of the seawall is the sole cause for the accelerated erosion rate at Aliomanu Bay.

time the Planning Commission issued Morgan's SMA Use permit, it could not foresee and anticipate every emergency which might present itself or make proper provisions for conditions which might arise in the future. As such, under the circumstances of the instant case, the Planning Commission must possess the inherent power to reconsider a validly issued SMA Use permit. This inherent power is made clear in light of the supervisory nature of the Planning Commission's authority, the CZMA's express mandate, the public's interest, and Hawai'i's public trust doctrine.[12] Accordingly, under the facts and circumstances presented in the underlying case, the Planning Commission has inherent authority to reconsider a validly issued SMA Use permit to carry out its statutory obligations under the CZMA.

b. *The Planning Commission has implied authority to modify condition no. 6 of Morgan's SMA Use permit.*

"An administrative agency can only wield powers expressly or implicitly granted to it by statute." *TIG Ins. Co. v. Kauhane,* 101 Hawai'i 311, 327, 67 P.3d 810, 826 (App. 2003). However, it is well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers expressly granted. *See, e.g., Kauhane,* 101 Hawai'i at 327, 67 P.3d at 826; *D.A.B.E., Inc. v. Toledo–Lucas County Bd. of Health,* 96 Ohio St.3d 250, 773 N.E.2d 536, 545–46 (2002) (noting that a statute's grant of power to an administrative agency "may be either express or implied, but the limitation put upon the implied power is that it is only such as may be reasonably necessary to make the express power effective"); *Public Util. Comm'n of Texas v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 315 (Tex.2001) ("The basic rule is that a state administrative agency has only those powers that the Legislature expressly confers upon it. But an agency may also have implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature."). The reason for implied powers is that, "[a]s a practical matter, the [l]egislature [cannot] foresee all the problems incidental to ... carrying out ... the duties and responsibilities of the [agency]." *See C.C.T. Equip. Co. v. Hertz Corp.,* 256 N.C. 277, 123 S.E.2d 802, 806 (1962).

Although HRS ch. 205A does not expressly authorize the Planning Commission to revoke, amend, or modify SMA Use permits, the legislature expressly granted to the Planning Commission the authority to carry out the objectives, policies and procedures of the CZMA's SMAs. HRS § 205A–27. In order to carry out this express responsibility, the Planning Commission must have authority to enforce the conditions of a SMA Use permit. Accordingly, therefore, the Planning Commission has the power to revoke, amend, or modify a SMA Use permit, inasmuch as this power is reasonably necessary to carry out the Planning Commission's express authority granted under the CZMA.

107. Dr. Edward Noda, an expert in the field of coastal and ocean engineering, ... conducted an analysis which charted the cumulative shoreline changes (vegetation line movement) at Aliomanu Bay from 1962–1988.

108. Dr. Noda testified after the seawall was constructed, the area south of the seawall experienced significant variations in the movement of the vegetation line. Dr. Noda further testified that no other area in Aliomanu sustained the type of variation seen in the area south of the seawall after the seawall was constructed.

109. Dr. Noda further stated that in the approximately 20 years prior to the seawall being constructed, the area south of the seawall did not sustain the type and magnitude of variation to the shoreline as it did after the seawall was constructed.

12. The scope of Hawai'i's Public Trust Doctrine is set forth in article XI, section 1 of the Hawai'i Constitution and provides:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawai'i's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
All public natural resources are held in trust by the State for the benefit of the people.

Clearly, the underlying intent of the CZMA is to protect, preserve, and, where possible, restore the natural resources of Hawai'i's coastal zone. As the designated authority to carry out the CZMA's policies and objectives, the Planning Commission is vested with broad power and authority in implementing the CZMA's mandate. As such, the Planning Commission must have jurisdiction over SMA Use permits to ensure compliance with the CZMA, and, therefore, has both the authority to reconsider and the implied authority to modify a validly issued SMA Use permit.

2. *Inasmuch as this court will not permit an interpretation of HRS § 205A–29 that produces an absurd result, HRS § 205A–29 must be interpreted to give effect to the CZMA's purpose.*

The Planning Department and Planning Commission maintain that, because the circuit court's interpretation of the "finality" language of HRS § 205A–29 would lead to absurd results, inasmuch as the Planning Department and Planning Commission would need to file a court action each time a SMA Use permit needs modification, the Planning Commission's inherent authority to reconsider its own decisions would be affected. Because this court will not permit an interpretation of HRS § 205A–29 that produces an absurd result, the Planning Department's and Planning Commission's argument is meritorious.

■■■ A cardinal rule of statutory construction is that "legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect." *Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 54–55, 868 P.2d 1193, 1201–02 (citation, internal quotation marks, and brackets omitted), *recon. denied,* 76 Hawai'i 247, 871 P.2d 795 (1994). Hence, "[t]he starting point in statutory construction is to determine the legislative intent from the language of the statute itself." *Bowers v. Alamo Rent–A–Car, Inc.,* 88 Hawai'i 274, 277, 965 P.2d 1274, 1277 (1998) (citations and internal quotation marks omitted). Indeed, absent any constitutional obstacles in applying the law,

this court's chief duty is to ascertain and give effect to the legislature's intention to the fullest degree, which is obtained primarily from language contained in the statute itself. When a law is enacted, a presumption exists that the words in the statute express the intent of the legislature.

Although a departure from a literal construction of a statute is justified when such construction would produce an absurd result and ... is clearly inconsistent with the purposes and policies of the act, this court may not reject generally unambiguous language if construction can be legitimately found which will give force to and preserve all the words of the statute.

*Sato v. Tawata,* 79 Hawai'i 14, 22–23, 897 P.2d 941, 949–50 (1995) (Ramil, J., dissenting) (citations, internal quotation marks, and brackets omitted). As such, statutory language must be read in the context of the entire statute and be construed in a manner consistent with its purpose. *Bowers,* 88 Hawai'i at 277, 965 P.2d at 1277. Therefore, "a rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable[,]" inasmuch as "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Id.* (citations, internal quotation marks, and brackets omitted); *see also Sato,* 79 Hawai'i at 23, 897 P.2d at 950 (explaining that, if a rational, sensible and practical interpretation is reasonably possible, "this court must presume that the legislature meant what it said and is further barred from rejecting otherwise unambiguous statutory language—absent some compelling evidence to the contrary, *e.g.* unmistakable support in the history and structure of the legislation"). Accordingly, "it is well settled that this court may depart from a plain reading of a statute where a literal interpretation would lead to absurd and/or unjust results." *Iddings v. Mee–Lee,* 82 Hawai'i 1, 15, 919 P.2d 263, 277 (1996). *See generally In re Water Use Permit Applications (Waiahole),* 94 Hawai'i 97, 173, 9 P.3d 409, 485 (2000) (noting that provisions of the code "should not be construed so rigidly as to

create an absurdity, or worse yet, to circumvent the Commission's constitutional and statutory obligations").

HRS § 205A–29 provides, in relevant part, that "[a]ction on the [SMA Use] permit shall be final unless otherwise mandated by court order." Although the language of HRS § 205A–29 appears to be plain and unambiguous, what constitutes "action" and "final unless otherwise mandated by court order" are unclear, and, therefore, the meaning behind the provisions of HRS § 205A–29 is ambiguous. Unfortunately, the legislative history of HRS § 205A–29 provides little guidance as to the definition of "action" and "final unless otherwise mandated by court order." As such, HRS § 205A–29 must be read in the context of the entire CZMA and construed in a manner consistent with its purpose.

Furthermore, when HRS § 205A–29 was enacted, it is presumed that the legislature did not intend an absurd result. No language appears in the statute susceptible to the circuit court's interpretation that the Planning Commission lacked authority to *modify* condition no. 6 of Morgan's SMA Use permit. Rather, when viewing the statute in its entirety, the CZMA's primary purpose was to establish a regulatory scheme to protect the environment and natural resources of Hawai'i's shoreline areas. However, pursuant to the circuit court's interpretation of HRS § 205A–29, as understood by the Planning Department and Planning Commission, the Planning Commission would need to file a court action each time a SMA Use permit needs modification. This interpretation is unreasonable and circumvents the Planning Commission's statutorily mandated authority under the CZMA. This court will not permit

an interpretation of HRS § 205A–29 that produces such an absurd result.

3. *The plain language of Rules §§ 1–12–8(b) and 1–12–9(b) of the Planning Commission's Rules of Practice and Procedure authorize revocation and modification of SMA Use permits.*

The Planning Commission amended its Rules of Practice and Procedure in 1992 by adding chapter 12—"Revocation and Modification of Permits."[13] Pursuant to this chapter, in particular § 1–12–8(b), "[i]f the Commission finds that any term or condition of a permit has been violated or not complied with, the Commission may revoke, amend or modify the permit or may allow the permit holder a reasonable opportunity to correct, remedy or rectify the violation." Further, pursuant to § 1–12–9(b), "[f]or good cause shown, the Commission may act to modify or delete any of the conditions imposed."

HRS ch. 205A, the enabling legislation that delegates to the Planning Commission the authority to, *inter alia*, issue SMA Use permits, expressly delineates that the Planning Commission give effect to the CZMA's policies and objectives. Inasmuch as PCRPP §§ 1–12–8(b) and 1–12–9(b) permit the revocation and modification of SMA Use permits if a permit holder violates or fails to comply with any term or condition of a SMA Use permit, the Planning Commission's authority must be read to allow the Planning Commission to revoke and modify validly issued SMA Use permits in giving effect to its statutory duties under the CZMA.

In 1981, the Planning Commission granted Morgan a SMA Use permit, subject to nine conditions. In 1996, however, in response to complaints of erosion and damage to neighboring properties caused by the seawall, and

---

**13.** Morgan argues that Chapter 12 of the Planning Commission's Rules of Practice and Procedure should not retrospectively apply to the 1981 SMA Use permit. Morgan's argument is without merit. Chapter 12 was validly promulgated on November 5, 1992, inasmuch as the Planning Commission is authorized to promulgate such rules and regulations as it deems necessary to enforce and carry out the objectives, policies and procedures of the CZMA. *See* HRS § 205A–29 ("Any rules adopted by the authority shall be consistent with the objectives, policies, and spe-

cial management guidelines provided in this chapter."); *see also* HRS § 205A–5(a) ("All agencies shall ensure that their rules comply with the objectives and policies of this chapter and any guidelines enacted by the legislature."). Because the Planning Department petitioned the Planning Commission in 1996, Chapter 12 was already in effect, and, therefore, governed the Planning Commission's authority to revoke, amend, or modify the 1981 SMA Use permit for changed conditions.

because Morgan failed to comply with specific terms and conditions of the SMA Use permit, the Planning Department filed a petition to revoke, amend or modify Morgan's SMA Use permit. Subsequently, in 1997, the Planning Commission modified condition no. 6 of the SMA Use permit. Accordingly, in giving effect to the objectives and policies of the CZMA and ensuring Morgan's compliance with the conditions of the SMA Use permit, the Planning Commission had authority to modify condition no. 6 of Morgan's SMA Use permit.

## C. The circuit court did not err in holding that the Planning Commission lacked authority to issue injunctive relief on its own.

The Planning Department and Planning Commission argue that the circuit court erred, as a matter of law, in concluding that the Planning Commission lacked authority to order injunctive relief. The Planning Department and Planning Commission specifically contend that, inasmuch as the Planning Commission is vested with the authority to carry out the objectives, policies and procedures of the CZMA under HRS § 205A-2, the circuit court's interpretation of HRS §§ 205A-33 and 205A-29 to hold that the Planning Commission lacked authority to order Morgan to remove, modify, or repair the seawall was erroneous. Moreover, the Planning Department and Planning Commission maintain that, because numerous conditions of Morgan's SMA Use permit were violated, the Planning Commission's actions were consistent with the CZMA's policy of "requiring replacement of coastal resources ... when such resources will be unavoidably damaged by development." As discussed *infra*, we hold that (1) the CZMA expressly grants injunctive power to the circuit court pursuant to the plain language of HRS § 205A-33, (2) the Planning Commission improperly attempted to mandate injunctive relief by ordering Morgan to conduct a sand replenishment program, and (3) the Planning Commission properly provided Morgan a reasonable opportunity to rectify the problem caused by Morgan's noncompliance with the SMA Use permit by ordering Morgan to (a) alter the southern portion of the seawall to provide a sloped, curved return rock revetment and (b) repair the seawall and the areas immediately mauka of it.

1. *The CZMA expressly grants injunctive power to the circuit court.*

A cardinal rule of statutory construction is that "legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect." *Richardson,* 76 Hawai'i at 54–55, 868 P.2d at 1201–02 (citation, internal quotation marks, and brackets omitted). Therefore, it is well established that,

> when construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation.

*Furukawa v. Honolulu Zoological Soc'y,* 85 Hawai'i 7, 12, 936 P.2d 643, 648 (1997).

The CZMA expressly grants injunctive power to the circuit court. Specifically, HRS § 205A-33 provides that "*[a]ny person or agency violating any provision of this chapter may be enjoined by the circuit court* of the State by mandatory or restraining order necessary or proper to effectuate the purposes of this chapter in a suit brought by the authority or the lead agency." (Emphasis added.) Thus, pursuant to HRS § 205A-33, the Planning Commission has authority to bring a cause of action in circuit court to obtain an injunction to effectuate the purposes of HRS chapter 205A. Moreover, under HRS § 205A-6(c), "*[a] court,* in any action brought under this section, *shall have jurisdiction to provide any relief as may be appropriate, including a temporary restraining order or preliminary injunction.*" (Emphasis added.) Based on the plain language of HRS §§ 205A-33 and 205A-6(c), it is clear and unambiguous that injunctive power resides with the circuit court.

Conversely, there is no provision in HRS chapter 205A that expressly delegates to the authority or lead agency, such as the Planning Commission, the power to order injunctive relief on its own. *See Kauhane,* 101 Hawai'i at 327, 67 P.3d at 826 (noting that an agency's power is governed by statute, and, therefore, an agency may only exercise those powers granted to it by statute). Indeed, if the legislature intended to grant the Planning Commission injunctive powers, it would have done so by expressly providing the Planning Commission such power. *See generally id.* The legislature's intent is apparent. By omitting any reference authorizing the authority or lead agency, such as the Planning Commission, to order injunctive relief on its own, the CZMA makes clear that the power to enjoin is solely granted to the circuit court. *See* HRS §§ 205A–33 and 205A–6(c). Accordingly, the provisions of the CZMA undoubtedly affirm that injunctive authority rests with the circuit court.

2. *By ordering Morgan to conduct a sand replenishment program, the Planning Commission improperly attempted to mandate injunctive relief.*

▮▮▮ An injunction is an extraordinary remedy. *Castle v. Kapena,* 5 Haw. 27 (1884) (holding that an injunction is an extraordinary remedy); *see also Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (observing that "a preliminary injunction is an extraordinary and drastic remedy"). Generally, an injunction is an equitable remedy designed to protect property or other rights from irreparable injury by prohibiting or commanding certain acts. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d

91 (1982); *Wichita Wire, Inc. v. Lenox,* 11 Kan.App.2d 459, 726 P.2d 287, 289 (1986). In other words, injunctive relief is ordinarily preventive or protective in character and operates upon unperformed acts rather than upon those that have already occurred. By definition, an injunction is

[a] court order prohibiting someone from doing some specified act or *commanding someone to undo some wrong or injury.* A prohibitive, *equitable remedy* issued or granted by a court at the suit of a party complainant, directed to a party defendant in the action, or to a party made a defendant for that purpose, forbidding the latter from doing some act which he is threatening or attempting to commit, or restraining him in the continuance thereof, such act being unjust and inequitable, injurious to the plaintiff, and not such as can be adequately redressed by an action at law. A judicial process operating in personam, and requiring person to whom it is directed to do or refrain from doing a particular thing. . . . *Generally, it is a preventive and protective remedy, aimed at future acts, and is not intended to redress past wrongs.*

Black's Law Dictionary 784 (6th ed.1990) (emphases added).

▮▮▮ In the instant case, the Planning Commission ordered Morgan to, *inter alia,* (1) conduct a sand replenishment program for the area immediately fronting the seawall,[14] and (2) offer Lizama and the Lemkes a one time sand replenishment program for the beach area immediately fronting their properties.[15] Ordering Morgan to conduct a sand replenishment program to undo the erosion caused by Morgan's noncompliance with the SMA Use permit was an equitable, rath-

14. The Planning Commission's decision and order read, in relevant part, as follows:

IT IS HEREBY ORDERED that in lieu of removing the existing noncomplying seawall, [Morgan] obtain all necessary permits to *conduct a sand replenishment program for the area immediately fronting the subject seawall.* The sand replenishment program shall be designed to restore the beach area fronting the seawall to the boundary of the 1977 shoreline[.] . . . Said sand replenishment program shall [be] designed to restore the beach area to roughly follow the 1977 shoreline measurements[.] . . . Subject to the obtaining of all necessary government permits and approvals[,] the sand

replenishment program shall be completed within two (2) years from the date of this Order, or some other period as the.[Planning] Commission may order. [Morgan] shall be responsible for all costs associated with this sand replenishment program. The [Planning] Commission shall retain jurisdiction over this matter in the event that [Morgan] fail[s] to complete the sand replenishment program within the two (2) year period or to clarify the provisions of this Order.
(emphasis added).

15. The Planning Commission's decision and order read, in relevant part, as follows:

er than a monetary remedy, and, therefore, injunctive in nature. Inasmuch as the CZMA clearly expresses that injunctive power is solely granted to the circuit court, the Planning Commission lacked authority to issue such an injunction. Accordingly, to the extent the circuit court held that the Planning Commission improperly attempted to mandate injunctive relief in violation of HRS § 205A–33 when it ordered Morgan to replenish sand, the circuit court's holding was not erroneous.[16]

3. *The circuit court erred in interpreting the Planning Commission's order mandating Morgan to (1) alter the southern portion of the seawall to provide a sloped, curved return rock revetment, and (2) repair the seawall and the areas immediately mauka of it as "injunctive in nature."*

 In the instant case, the Planning Commission found and concluded, *inter alia,*

IT IS FURTHER ORDERED that in lieu of removing the existing noncomplying seawall, [Morgan] *offer the neighbors immediately south of the seawall (Lemkes . . . and the Lizamas . . .) to initiate a one time sand replenishment program for the beach area immediately fronting their properties.* The sand replenishment program shall be designed to restore the beach area fronting [the Lemkes and the Lizamas's properties], to the boundary of the 1977 shoreline[.] . . . [Morgan] shall be responsible for one hundred percent (100%) of the costs involved in applying and obtaining all necessary permits and approval and implementing the sand replenishment program. If this offer is not accepted by [the Lemkes and the Lizamas, Morgan] shall not be required to complete the sand replenishment in front of [their] properties.

(emphasis added).

16. The Planning Commission, however, still has an opportunity to seek such an injunction in circuit court, pursuant to HRS § 205A–33. At that time, the Planning Commission would be required to demonstrate that the issuance of an injunction was warranted, inasmuch as (1) the Planning Commission would likely prevail on the merits, (2) the balance of irreparable injury favored the issuance of an injunction, and (3) public interest supported granting an injunction. *Penn v. Transportation Lease Hawai'i, Ltd.,* 2 Haw.App. 272, 276, 630 P.2d 646, 649–50 (1981).

In addition, HRS § 205A–33 serves as a tool to enforce the Planning Commission's authority to order corrective action. For example, if Morgan refused to follow the Planning Commission's or-

that Morgan failed to comply with the conditions of the SMA Use permit, inasmuch as Morgan did not construct the seawall according to the approved plan and made unpermitted additions to the seawall. Furthermore, the Planning Commission found and concluded that the seawall caused significant adverse environmental effects to the shoreline and the SMA of Aliomanu, and caused significant erosion to neighboring properties by diminishing the beach area to a point where the beach no longer existed. Based on its findings of fact and conclusions of law, the Planning Commission ordered Morgan to, *inter alia,* (1) alter the southern portion of the seawall to provide a sloped, curved return rock revetment,[17] and (2) repair the seawall and the areas immediately mauka of it.[18] Inasmuch as the Planning Commission provided Morgan an opportunity to comply with the specific terms and conditions of the SMA Use permit, ordering Morgan to alter the

der, the Planning Commission could then seek an injunction from the circuit court pursuant to HRS § 205A–33.

17. The Planning Commission's decision and order read, in relevant part, as follows:

IT IS FURTHER ORDERED that [Morgan] *alter the southern portion of the seawall to provide a sloped, curved return rock revetment* to limit flanking erosion in a manner to be approved by the [Planning] Commission. . . . Construction of this sloping curved return revetment shall be completed within one (1) year from the date of this Order, or some other period as the [Planning] Commission may order. [Morgan] shall be solely responsible for all costs associated with this modification to the existing seawall. The [Planning] Commission shall retain jurisdiction in this matter in the event [Morgan] fail[s] to complete the alteration of the seawall has [sic] set forth in this Order.

(emphasis added).

18. The Planning Commission's decision and order read, in relevant part, as follows:

IT IS FURTHER ORDERED that [Morgan] *repair the seawall and the areas immediately mauka of the seawall* in a manner to be approved by the [Planning] Commission. [Morgan] shall submit a plan to the [Planning] Commission indicating the repairs that need to be made and how they will be done. [Morgan] shall be responsible for all costs associated with the repair of the seawall.

(emphasis added).

southern portion of the seawall to provide a sloped, curved return rock revetment and repair the seawall and the areas immediately mauka of it was not equitable relief, and, thus, was not injunctive in nature. By ordering such, the Planning Commission intended to ensure compliance with the original terms of the SMA Use permit. Accordingly, HRS § 205A–33 was not implicated.

Furthermore, the Planning Commission's Rules of Practice and Procedure clearly authorized the Planning Commission to order compliance with the SMA Use permit. As discussed *infra*, in section III.B.3., pursuant to PCRPP § 1–12–8(b), the Planning Commission may revoke, amend or modify SMA Use permits or "may allow the permit holder a reasonable opportunity to correct, remedy or rectify the problem" if it found that "any term or condition of a permit has been violated or not complied with[.]" Indeed, in issuing its decision and order, the Planning Commission must fulfill its statutory obligation under the CZMA to "preserve, protect, and where possible, [ ] restore the natural resources of the coastal zone of Hawai'i." HRS § 205A–21. As such, the Planning Commission was authorized, pursuant to PCRPP § 1–12–8(b) as well as its obligations under the CZMA, to issue an order providing Morgan "a reasonable opportunity to correct, remedy, or rectify the problem" by (1) altering the southern portion of the seawall to provide a sloped, curved return rock revetment and (2) repairing the seawall. The alternative would have been to revoke Morgan's SMA Use permit and require complete removal of the seawall. This alternative would be harsh without providing Morgan a reasonable opportunity to rectify the problem.[19]

In sum, the CZMA makes clear that the circuit court was empowered to issue injunctive relief. However, the Planning Commission had authority to "provide a reasonable opportunity to correct, remedy, or rectify the problem" resulting from noncompliance with a SMA Use permit. Moreover, inasmuch as (1) altering the seawall to provide a sloped, curved return rock revetment and (2) repairing the seawall was not equitable relief, such orders were not injunctive in nature. Accordingly, in those respects, the circuit court's holding that, "[b]y ordering [Morgan] to remove the seawall, or modify it, replenish sand, and repair it and the areas immediately mauka of it, the [Planning] Commission improperly attempted to mandate injunctive relief in violation of statutory provisions, specifically, HRS § 205A–33 and § 205A–29[,]" was wrong.

## IV. CONCLUSION

Based on the foregoing, we affirm that part of the circuit court's decision and order holding that, by ordering Morgan to replenish sand, the Planning Commission improperly attempted to mandate injunctive relief. However, we reverse (1) that part of the decision and order holding that the Planning Commission improperly attempted to mandate injunctive relief by ordering Morgan to alter the southern portion of the seawall to provide a sloped, curved return rock revetment and repair the seawall and the areas immediately mauka of it, and (2) that part of the decision and order holding that the Planning Commission lacked authority to modify a validly issued SMA Use permit for changed conditions.

19. Morgan, however, was not foreclosed from seeking judicial relief. Specifically, administrative procedures exist for an aggrieved party to obtain judicial review of a Planning Commission's decision. PCRPP § 1–6–18(i) authorizes that "[a]ny person aggrieved by a final order and decision of the Planning Commission may obtain judicial reviews thereof in the manner pursuant to HRS [chapter] 91." Furthermore, an aggrieved party can seek a remedy in the circuit court should the Planning Commission fail to comply with the CZMA. *See* HRS § 205A–6 (1993). As such, if Morgan believed that he should not be made to comply with the Planning Commission's decision and order, Morgan could bring a civil action in the circuit court as an aggrieved party.