**Electronically Filed
Supreme Court
SCWC-13-0004947
08-MAY-2018
08:06 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

PATRICIA NAKAMOTO, Petitioner/Plaintiff-Appellant,

vs.

JAMAE KAWAUCHI, in her individual and official capacity
as County Clerk, DOMINIC YAGONG, in his individual and official
capacity as Chairman, Hawai'i County Council, County of Hawai'i,
CORPORATE SPECIALIZED INTELLIGENCE AND INVESTIGATIONS LLC,
Respondents/Defendants-Appellees.
(CIVIL NO. 12-1-0466)

------------------------------------------------------------

SHYLA A. AYAU, Petitioner/Plaintiff-Appellant,

vs.

JAMAE KAWAUCHI, in her individual and official capacity
as County Clerk, DOMINIC YAGONG, in his individual and official
capacity as Chairman, Hawai'i County Council, County of Hawai'i,
CORPORATE SPECIALIZED INTELLIGENCE AND INVESTIGATIONS LLC,
Respondents/Defendants-Appellee.
(CIVIL NO. 12-1-0467)

SCWC-13-0004947

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0004947)

MAY 8, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. Introduction

This case concerns common law tort claims in the employment context. Petitioners Patricia Nakamoto and Shyla M. Ayau (collectively, "Petitioners") were employees of the County of Hawaiʻi (the County), whose employment was terminated following an investigation into alleged employee misconduct, including the use of a County Elections Office warehouse for private business purposes and to hold parties at which alcohol was consumed. An article was published in a local newspaper about the terminations, which quoted County officials, Respondents Jamae Kawauchi (Kawauchi) and Dominic Yagong (Yagong), as making various statements about the terminations.

Petitioners brought the present action against the County, Kawauchi and Yagong in both their official and individual capacities, and Corporate Specialized Investigations and Intelligence Services, LLC (CSII), a licensed private investigation company which the County hired to conduct the

2

investigation.  Petitioners alleged that the defendants had caused defamatory statements about them to be published in the local newspaper, and that the investigation had been conducted negligently.

The circuit court granted the County's motion to dismiss, finding that Petitioners' claims were barred by the Workers' Compensation Law (WCL) because Petitioners' alleged injury to their reputations arose through the course and scope of their employment.[1]  The circuit court also granted summary judgment in favor of Kawauchi and Yagong, finding that Petitioners had failed to adduce evidence raising a genuine issue of material fact that Kawauchi and Yagong had made false statements about them.  Finally, the circuit court granted summary judgment in favor of CSII, finding that as a third-party investigator, it had no duty towards Petitioners.

Petitioners appealed to the Intermediate Court of Appeals (ICA), which affirmed the circuit court in all respects, except that it held that the circuit court erred in holding that allegedly defamatory statements made <u>after</u> termination were barred by the WCL.  However, the ICA did not vacate the circuit court's grant of the motion to dismiss, because it held as a matter of law that Kawauchi's and Yagong's alleged defamatory

---

[1]     The Honorable Elizabeth A. Strance presided.

3

statements were true.

On certiorari, Petitioners raise several issues.  They argue that the ICA erred in holding that the WCL exclusivity provision covers reputational injuries.  Petitioners also argue that the ICA erred in holding that Kawauchi's and Yagong's statements were true as a matter of law.  Finally, Petitioners argue that the ICA erred in holding that CSII did not owe a duty to Petitioners to conduct an objective investigation.

First, based on the language and purpose of the statute, we hold that the WCL's bar on claims for injuries incurred in the course of employment does not extend to injuries to a person's reputation.  Accordingly, employees may bring defamation and false light claims against their employers.

Second, we affirm summary judgment in favor of Kawauchi, but vacate summary judgment in favor of Yagong in his individual capacity, because we conclude that whether Yagong's allegedly defamatory statements were true involves a disputed question of material fact.  Accordingly, we also vacate the circuit court's dismissal of Petitioners' defamation and false light claims against the County and Yagong in his official capacity, as Petitioners can assert those claims based on our holding that those claims are not barred by the WCL.

Finally, we conclude that CSII owed a legal duty of

4

care to Petitioners, because we hold that licensed private investigators owe a duty of care to the subjects of their investigations. We vacate and remand for a determination of whether CSII breached that duty.

## II. Background

### A. Circuit Court Proceedings

Nakamoto and Ayau filed separate complaints in circuit court. Both complaints named as defendants Kawauchi and Yagong in their official and individual capacities, the County, CSII, and Doe individuals and entities.

#### 1. Allegations in the Complaints

Taken together, the complaints give the following account of the termination of Petitioners' employment at the County. Nakamoto began her employment at the County of Hawaiʻi Elections Division in 1982, and her title was Election Programs Administrator when she was fired. Ayau was hired as a full-time elections clerk in 2005, and at the time her employment was terminated, her title was Senior Elections Clerk.

In July 2011, Kawauchi, who was the County Clerk, and Yagong, who was the County Council Chairman, inspected a privately-owned warehouse in Hilo that had been leased to the County to store equipment for the Office of Elections. There they "observed items that they concluded were violations of

5

County policies"; they subsequently "identified and targeted" Petitioners and other County employees "to be terminated." Kawauchi and Yagong hired CSII to investigate the apparent violations of County policy, and they "pre-determined a particular course of action" against Petitioners and other County employees.

CSII conducted its investigation, and in September 2011, it submitted an "Investigative Report," which Petitioners attached as an exhibit to their respective complaints. The report indicated that a County employee, Glen Shikuma, had operated a private sign-making business from the warehouse. The report also found that "on more than one occasion alcoholic beverages have been consumed" by employees at the warehouse, and that a "'year-end get-together' when alcoholic beverages were being consumed" was held at the warehouse. The report indicated that Petitioners admitted to attending year-end parties at the warehouse, but denied knowledge of Shikuma's unauthorized business activities.

Kawauchi held pre-termination hearings for both Petitioners. The complaint alleged that during the hearing, Nakamoto's union representative asked Kawauchi for copies of the County's policies that Nakamoto had allegedly violated, and Kawauchi replied that "she did not know what the policies were

6

and that she would look them up and send them to" Nakamoto and her union representative.

On January 9, 2012, Kawauchi sent Ayau a termination letter which "falsely accused" her of misconduct, including violating the County alcohol policy. Kawauchi sent Nakamoto a notice of termination, postmarked January 10, 2012. The notice accused Nakamoto of violating the County alcohol policy, conducting personal or other business unrelated to County business at the elections warehouse, dereliction of duties as the election program administrator, and storing confidential elections information unsecuredly.

On January 12, 2012, two to three days after Kawauchi sent Petitioners their notices of termination, the Hawaiʻi Tribune Herald newspaper published an article entitled, "County elections workers fired," detailing the termination of Petitioners and other County employees in connection with the alleged misconduct at the warehouse. The complaints recounted the following excerpts from the article:

> The infractions dealt with "**violations of county policy**," the Hamakua councilman [Yagong] said Wednesday.
>
> . . .
>
> The investigation started with Shikuma, who is accused of <u>running a sign printing business out of the elections warehouse and also storing alcohol there</u>.
>
> . . .

> One source said he's seen Shikuma storing alcohol
> bottles in the warehouse and also attending a <u>year-end
> party</u>, complete with alcohol, held in the parking lot.

Petitioners asserted that Nakamoto received permission
to hold end-of-year potlucks at the elections warehouse. They
excerpted from, and attached to their complaint, written
statements from former Hawaiʻi County Clerks Kenneth Goodenow and
Casey Leigh. In his statement, Goodenow asserted that he had
authorized the holding of a post-election potluck in 2010, and
that he was not questioned by an investigator about the event or
Petitioners' terminations. In her statement, Leigh stated that
the post-election potluck was held only in the parking lot of the
elections warehouse, that she did not object to the party, and
that "the private investigator who looked into the allegations of
wrongdoing against election staff members never contacted me,
even though both the County Clerk and Council Chair Yagong were
aware that I had been the Clerk during the period of the
allegations against Ms. Nakamoto."

Petitioners concluded that Kawauchi, Yagong, and CSII
"leaked false and misleading information to the media concerning
[Petitioners'] termination."

Nakamoto grieved her dismissal, and on June 21, 2012,
the County rescinded the dismissal and agreed to her
reinstatement subject to a ten-day suspension. Ayau resumed her

8

employment on September 4, 2012, and the County agreed to her transfer to the County of Kauaʻi.[2]

The complaints list five counts against all defendants: I) defamation per se; II) defamation per quod; III) false light; IV) negligent investigation; and V) negligent infliction of emotional distress (NIED).

### 2.    Circuit Court Proceedings

#### a.    The County, and Kawauchi and Yagong in Their Official Capacities

The County[3] filed motions to dismiss both complaints, arguing that Petitioners' claims were barred by the WCL's exclusivity provision[4] because their claims arose through the course and scope of their employment.  The County also argued

---

[2]    While Ayau's complaint does not allege that she grieved her dismissal, other materials in the record indicate that she grieved her dismissal.

[3]    Specifically, the motions were filed on behalf of the County, and Kawauchi and Yagong in their official capacities.  All subsequent submissions by the County likewise included Kawauchi and Yagong in their official capacities.

[4]    HRS § 386-5 (1993) provides:

> The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

that the claims against Kawauchi and Yagong in their official capacities "are merely duplicative of the claims against the County and must be dismissed."  The circuit court granted the County's motions on all five of Petitioners' claims, agreeing with the County that the claims were barred by the WCL's exclusivity provision.

### b.    Kawauchi and Yagong in Their Individual Capacities

Kawauchi and Yagong, in their individual capacities, filed motions to dismiss Petitioners' complaints.  In their opposition, Petitioners requested that the court convert the motions to dismiss into a motion for summary judgment.  The circuit court granted that request, and provided that the parties could supplement their motion and opposition.  The parties provided supplemental summary judgment briefing.

In their motions, Kawauchi and Yagong argued that Petitioners' claims were barred by the WCL because their claims against Kawauchi and Yagong in their individual capacities were identical to those in their official capacities, and Petitioners failed to meet the Iddings v. Mee-Lee, 82 Hawai'i 1, 919 P.2d 263 (1996) pleading standard for willful and wanton conduct under HRS § 386-8.[5]

---

[5]    HRS § 386-8 extends immunity from suit to an injured worker's co-employees, unless the co-employees' conduct was willful or wanton.
(continued...)

10

Kawauchi and Yagong also argued that Petitioners failed to allege which statements made by Kawauchi and Yagong were false.  They argued that Nakamoto's complaint acknowledges that Nakamoto "was relieved of her duties due to her violation of the County's zero tolerance alcohol policy."  Kawauchi and Yagong argued that the results of CSII's investigation were undisputed facts.  Kawauchi and Yagong included declarations explaining that they had relied on information contained in CSII's investigative reports in deciding to terminate Petitioners.  They argued that CSII reported that Nakamoto admitted that she was present at an elections warehouse party, and that Elton Nakagawa stated that he witnessed Nakamoto drinking alcohol.  The CSII reports attached as exhibits stated that CSII had interviewed Ayau, and that Ayau admitted that she had consumed alcoholic beverages at the elections warehouse.  CSII's reports also included transcripts of employee interviews, including that of Nakamoto, in which she admitted that she was present at an elections warehouse gathering

_____

⁵(...continued)
Iddings, 82 Hawaiʻi 6, 919 P.2d at 268.  This court in Iddings held that conduct is willful and wanton when it is:

> (1) motivated by an actual intent to cause injury; or
> (2) committed in circumstances indicating that the
> injuring employee (a) has knowledge of the peril to be
> apprehended, (b) has knowledge that the injury is a
> probable, as opposed to a possible, result of the
> danger, and (c) consciously fails to avoid the peril.

Id. at 12, 919 P.2d at 274.

11

during which others had consumed alcohol, and that of Nakagawa, who stated that he saw Nakamoto drinking alcohol.

Kawauchi and Yagong argued that it was an undisputed fact that they terminated Petitioners in order "to perform their official duties and enforce County policy," and that the terminations were based solely upon "evidence they each observed and the findings and results contained in the CSII Investigative Reports." They argued that it was an undisputed fact that, "[n]otwithstanding these findings . . . without ever seeking (or gaining) the approval of either Kawauchi or Yagong," the County agreed to reinstate Petitioners' employment.

Petitioners argued in opposition that Kawauchi and Yagong made false statements concerning the basis of Nakamoto's and Ayau's terminations. They argued that they did not commit the underlying violations, as evidenced by the fact that their terminations were reversed. Petitioners argued that Kawauchi and Yagong acted against County instructions in terminating Petitioners. They quoted an excerpt from, and attached as an exhibit to their opposition, the deposition of the County's Director of Human Resources, Ronald Takahashi, who stated that, in approximately July or September of 2011, before Petitioners were terminated, he met with Kawauchi and Yagong regarding the results of CSII's investigation, and told them that there was not

12

enough evidence from CSII's investigation to terminate Nakamoto.

Petitioners also attached as an exhibit a letter from Nicholas Hermes, a County Human Resources Manager, to Kawauchi regarding Petitioners' grievances. Hermes stated that he was "tremendously disappointed" with the Office of the County Clerk's "inaction toward routine processing" of the grievances and that it was clear that the grievance delay was due to the Office of the County Clerk's "lack of assertiveness and suspected willful stalling." Petitioners also argued that, contrary to Kawauchi's and Yagong's assertion, it was a disputed fact that the results of CSII's investigation were accurate, contending that defendants intentionally chose not to interview certain witnesses, including Kevin Akiyama, owner of the elections warehouse, and former County Clerks Goodenow and Leigh.

Kawauchi and Yagong argued in reply, inter alia, that because the County Clerk appoints its staff, the County Clerk was not under a duty to act based upon Takahashi's opinion. Kawauchi and Yagong argued further that Takahashi had admitted publicly that he had a conflict of interest regarding the investigation of Shikuma, and attached as support exhibits newspaper articles discussing that issue.

The court filed an order granting Kawauchi's and Yagong's motion for summary judgment, finding that Petitioners

13

had failed to present evidence that Kawauchi and Yagong had engaged in "willful and wanton" conduct that would put Petitioners' claims beyond the scope of the WCL's exclusivity provision. The court also found that Petitioners had not presented evidence of false or defamatory statements attributable to Yagong and Kawauchi.

The circuit court subsequently sua sponte amended its order granting summary judgment in favor of Kawauchi and Yagong individually, stating that its original order "went beyond the limited scope of its intention and arguably contains findings which invade the province of a workers compensation hearings officer." The court held that while there was conflicting evidence regarding the manner in which the investigation into Petitioners' alleged misconduct was handled, there was an absence of evidence that Kawauchi and Yagong made false statements about Petitioners. The court concluded that, as such, Kawauchi and Yagong had demonstrated that Petitioners would be unable to carry their burden of proof at trial.

### c. CSII

CSII filed a motion for summary judgment, arguing, inter alia, that "there are no defamatory statements attributable to CSII" in Petitioners' complaints, and that CSII did not owe a duty to Petitioners. CSII argued that there was no special

relationship between Petitioners and CSII such that a duty would arise from their relationship.  CSII also argued, even if it did owe a duty, that it did not breach a duty because CSII interviewed County employees designated by a County Human Resources manager as employees in the elections division, advised the employees that they were being interviewed in connection with activities at the warehouse, and obtained permission from the employees and their union representative to record the interviews.

In their opposition, Petitioners argued that CSII owed a duty of reasonable care to Petitioners to conduct an impartial investigation, because, as public sector employees, Petitioners could only be terminated for just cause.  They argued that a just cause termination requires a fair and objective investigation into the employee's alleged misconduct.  Petitioners also argued that the owner of CSII, Kevin Antony, is a professional private detective licensed by the State of Hawaiʻi and, "[a]s such, CSII is held to a higher standard of care, and before releasing the information of its reports to its clients, should have considered the accuracy of the data collected due to the risk associated with releasing information that later proves to be unreliable."

Petitioners argued that CSII's investigation was negligent because CSII offered a narrow selection of negative

15

evidence procured through a biased process, while suppressing broad categories of favorable and exculpatory evidence. Petitioners argued that CSII failed to properly interview or, in some cases, interview at all, critical witnesses, including former County clerks, Goodenow and Leigh.

The circuit court filed an order granting CSII's motion for summary judgment. As to the defamation and false light claims, it found that Petitioners "failed to present any admissible evidence to demonstrate that any defamatory statement was published by CSII that was unprivileged and concerned [Petitioners]." As to the negligent investigation claim, the court held that CSII owed no duty to Petitioners.

On October 3, 2013, the circuit court entered Judgment in favor of all defendants.

## B.  ICA Proceedings

Petitioners appealed, challenging the circuit court's holdings as to their defamation, false light, and negligent investigation claims. Regarding their defamation and false light claims, Petitioners argued that their claims were "not a 'personal injury' as defined by HRS [§] 386-3,"[6] asserting that

---

[6]  HRS § 386-3 (Supp. 1998) provides, in relevant part (emphasis added):

> (a) If an employee suffers personal injury either by
> (continued...)

16

the majority of jurisdictions recognize that defamation does not fall within workers' compensation exclusivity. Petitioners also contended that their injuries resulting from the alleged post-termination defamation did not arise out of their employment, and thus were not covered by the WCL's exclusivity provision.

As to their negligent investigation claim, Petitioners argued that CSII was negligent in its investigation, having "failed or ignored to interview or properly interview critical witnesses." Petitioners asserted that CSII "owed a duty of reasonable care to [Petitioners] to conduct an impartial investigation," and that its failure to do so constituted a "reckless disregard" that caused their injuries.

The ICA affirmed the circuit court's judgment. Regarding Petitioners' defamation and false light claims, the ICA agreed with the circuit court's conclusion that such claims are generally within the WCL's exclusivity provision. The ICA relied on its decision in Yang v. Abercrombie & Fitch Stores, 128 Hawai'i 173, 284 P.3d 946(App. 2012), which held that intentional tort claims, including defamation, were barred by the WCL.

_____

[6](...continued)
accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

17

However, the ICA determined that any defamatory statement made after Petitioners' termination would not be barred by the WCL, as the statements would not meet "an essential prerequisite for coverage under the WCL--the existence of an employer-employee relationship." Accordingly, the ICA concluded that the circuit court erred in ruling that the WCL bars Petitioners' defamation and false light claims to the extent those claims are based on statements made after the termination of their employment.

As to the grant of summary judgment in favor of Kawauchi and Yagong, the ICA found that there was no genuine issue of material fact as to the claims against Kawauchi and Yagong. The ICA noted that "truth is an absolute defense" to defamation claims, and that a false light claim arising from the same statement as a defamation claim must be dismissed if the defamation claim is dismissed. The ICA determined that Kawauchi and Yagong had submitted undisputed evidence demonstrating that the allegedly defamatory statements published in the January 12, 2012 Hawaiʻi Tribune Herald article were true. Accordingly, the ICA concluded that the circuit court properly granted summary judgment in favor of Kawauchi and Yagong as individuals.

Having held that the circuit court properly granted summary judgment in favor of Kawauchi and Yagong as individuals, the ICA determined that the law of the case doctrine barred

18

Petitioners from reasserting their claims against the County and against Kawauchi and Yagong in their official capacity. The ICA explained that Petitioners asserted identical allegations against Kawauchi and Yagong whether in their individual or official capacities, and that the claims against the County were for respondeat superior liability related to Kawauchi's and Yagong's alleged conduct. Accordingly, although the post-termination claims were not barred by the WCL exclusivity provision, further litigation was precluded because Kawauchi's and Yagong's statements were true.

Regarding the circuit court's grant of summary judgment in favor of CSII, the ICA found that CSII owed no duty to Petitioners. The ICA reasoned that "[Petitioners] did not submit any evidence to suggest that CSII realized or should have realized that its investigation posed an unreasonable risk of harm to [Petitioners] through the negligent or reckless conduct of Kawauchi, Yagong, or any other third party." Accordingly, the ICA concluded that summary judgment in favor of CSII was properly granted.

Based on the foregoing, the ICA affirmed the circuit court's judgment as to all defendants.

## III.  Standards of Review

### A.  Motion to Dismiss

> A trial court's ruling on a motion to dismiss is reviewed <u>de novo</u>.  The court must accept plaintiff's allegations as true and view them in the light most favorable to the plaintiff; dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief.

<u>Wong v. Cayetano</u>, 111 Hawai'i 462, 476, 143 P.3d 1, 15 (2006)

(internal quotation marks and citations omitted).

### B.  Summary Judgment

> [An appellate court] reviews the circuit court's grant of summary judgment <u>de novo</u>.  <u>Price v. AIG Hawai'i Ins. Co.</u>, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  HRCP Rule 56(c).

<u>Gillan v. Gov't Emps. Ins. Co.</u>, 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008).

### C.  Statutory Interpretation

> Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard.
>
> Our statutory construction is guided by the following well established principles:
>
> > our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
> >
> > When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an

20

> expression used in a statute, an ambiguity exists.
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.
>
> The appellate court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

Lingle v. Hawai'i Gov't Emp. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets and ellipses omitted) (quoting Guth v. Freeland, 96 Hawai'i 147, 149-50, 28 P.3d 982, 984-85 (2001)).

## IV. Discussion

Petitioners present three questions to this court in their application for writ of certiorari:

> A. Did the ICA commit grave error by extending workers' compensation exclusivity to injuries involving a person's reputation?
>
> B. Did the ICA commit grave error by determining the "truth" of disputed facts which was a question for the jury?
>
> C. Did the ICA commit grave error by holding that no duty exists to conduct an objective investigation in support of employee discipline for public sector employees?

Regarding Petitioners' first question, we hold that the WCL's bar on claims for injuries incurred in the course of employment does not extend to injuries to a person's reputation,

21

and accordingly, to defamation and false light claims.  The purpose of the WCL is to compensate employees for work-related physical and mental injuries.  The purpose of defamation and false light actions is to compensate plaintiffs for harm to their reputation.  The WCL does not provide compensation for harm to reputation.  Given the differing purposes, and the lack of a remedy in the WCL, we hold that employees may bring defamation claims against their employers.  We overrule the ICA's decision in Yang v. Abercrombie & Fitch Stores, 128 Hawaiʻi 173, 284 P.3d 946 (App. 2012), to the extent it held otherwise.

Regarding Petitioners' second question, we address the grant of summary judgment in favor of Kawauchi and Yagong in their individual capacities.  We affirm summary judgment in favor of Kawauchi, but conclude that summary judgment was improperly granted as to Yagong, as there exists a disputed fact whether Yagong's allegedly defamatory statements were true.

Finally, regarding Petitioners' third question, we hold that CSII owed a legal duty of care to Petitioners in conducting its investigation.  Kevin Antony is a private investigator licensed pursuant to statute and regulations.  We hold, based on the statute and regulations, that licensed private investigators owe a duty of care to the subjects of their investigations.  Because our holding is based on CSII's role as a licensed private

22

investigator, we do not address Petitioners' argument that they are owed a duty because they are public sector employees.

**A.    Claims for Reputational Injuries, and, Accordingly, for Defamation and False Light, are Beyond the Scope of the WCL's Exclusivity Provision.**

Whether the WCL's exclusivity provision bars claims for defamation and false light is a question of first impression before this court.  When construing a statute, our foremost obligation is to "give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose."  Morgan v. Planning Dep't, Cty. of Kauai, 104 Hawai'i 173, 179, 86 P.3d 982, 988 (2004).  As set forth below, the language and purpose of the WCL lead us to conclude that the legislature did not intend for the WCL exclusivity provision to extend to defamation and false light claims.

In determining whether defamation and false light claims are barred by the WCL, we start with the statute's plain language.  See id.  The WCL exclusivity provision, HRS § 386-5, provides:

> The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee . . .

23

> at common law or otherwise, on account of the injury,
> except for sexual harassment or sexual assault and
> infliction of emotional distress or invasion of
> privacy related thereto, in which case a civil action
> may also be brought.

(Emphasis added.)

The WCL defines a "work injury" as "a personal injury suffered under the conditions specified in section 386-3." HRS § 386-1 (1993). HRS § 386-3, titled "Injuries covered," provides, in relevant part:

> (a) If an employee suffers personal injury either by
> accident arising out of and in the course of the
> employment or by disease proximately caused by or
> resulting from the nature of the employment, the
> employee's employer or the special compensation fund
> shall pay compensation to the employee or the
> employee's dependents as provided in this chapter.
>
> Accident arising out of and in the course of the
> employment includes the wilful act of a third person
> directed against an employee because of the employee's
> employment.

(Emphasis added.)

Assuming the word "personal" is not superfluous, the term "personal injury" does not extend to all legally cognizable injuries that might arise in the course of employment. See Camara v. Agsalud, 67 Haw. 212, 215, 685 P.2d 794, 797 (1984) ("It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute[.]"). In other words, the WCL does not provide a remedy for injuries that are not "personal." By extension, it does not bar actions in tort that seek to redress non-personal

24

injuries.  Whether defamation and false light claims are barred by the WCL thus depends on whether the harm inflicted is a "personal injury" under the WCL.

The plain language of HRS § 386-3 itself provides little guidance as to the definition of a personal injury. However, reading HRS § 386-3 "in the context of the entire statute and constru[ing] it in a manner consistent with its purpose" we hold that the harm inflicted by the torts of defamation and false light is not a "personal injury" under the WCL.  See Morgan, 104 Hawaiʻi at 179, 86 P.3d at 988.

The purpose of the WCL (codified in HRS Chapter 386), is to provide compensation to employees for work-related personal injuries.  Iddings, 82 Hawaiʻi at 8, 919 P.2d at 270.  While HRS Chapter 386 does not define "personal injury," the chapter contemplates compensation for physical and mental injuries.  The "underlying premise of the system" is "to enable the injured worker to receive timely and the most effective medical treatment and rehabilitation."  H. Stand. Comm. Rep. No. 575, in 1995 House Journal, at 1242.  As the ICA noted in Omori v. Jowa Hawaiʻi Co.:

> [W]orkers' compensation "is a branch of social insurance for workers aimed at protection against the consequences of work injuries."  S. Riesenfeld, Study of the Workmen's Compensation Law in Hawaii, Legislative Reference Bureau, Report No. 1 (1963), iii (emphasis added).  Professor Stefan Riesenfeld, the architect of the majority of the 1963 revisions to the Hawaiʻi Workers' Compensation Law, see Hse. Stand. Comm. Rep. No. 889, in 1963 House Journal, at 822;

> Sen. Stand. Comm. Rep. No. 334, in 1963 Senate Journal, at 788, identified the following three goals of workers' compensation:
>
> > (1) medical restoration and physiological rehabilitation [of the worker] as far as possible; (2) return of the permanently disabled worker to some gainful employment whenever possible, even where new skills must be developed; (3) provision of substantial relief for the economic and other losses incurred.

91 Hawai'i 157, 160–61, 981 P.2d 714, 717–18 (App. 1999), aff'd as modified, 91 Hawai'i 146, 981 P.2d 703 (1999).

Consistent with its purpose, the WCL's compensation structure provides payment for medical and vocational rehabilitation benefits, and income and indemnity benefits for total and partial disability and death caused by work injury. HRS §§ 386-21 to –57. The WCL provides that "[i]mmediately after a work injury . . . the employer shall furnish to the employee all medical care, services, and supplies as the nature of the injury requires." HRS § 386-21(a). In the case of certain injuries, such as the loss of a limb, the disability is deemed permanent, and the employer is required to pay the employee a weekly benefit. HRS § 386-31.

In contrast to the type of "personal injury" contemplated by the WCL, defamation and false light claims address altogether different types of harm. The tort of defamation has four elements:

> (a) a false and defamatory statement concerning another;

26

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Beamer v. Nishiki, 66 Haw. 572, 578–79, 670 P.2d 1264, 1271 (1983) (quoting Restatement (Second) of Torts § 588 (1977)).

We address these elements to determine the type of harm for which the defamation and false light causes of action compensate.[7]  As to the first element, "[a] communication is defamatory when it tends to harm the reputation of another as to lower him in the estimation of the community[.]"  Fernandes v. Tenbruggencate, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)

---

[7]     The tort of false light substantially overlaps with defamation, and "where a false-light claim is based on the same statements as a defamation claim, the false-light claim must be dismissed if the defamation claim is dismissed."  Wilson v. Freitas, 121 Hawai'i 120, 130, 214 P.3d 1110, 1120 (App. 2009) (citing Gold v. Harrison, 88 Hawai'i 94, 103, 962 P.2d 353, 362 (1998)).  The false light tort is defined as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Wilson, 121 Hawai'i at 130, 214 P.3d at 1120 (quoting Restatement (Second) of Torts § 652E (1977)).

27

(quotation marks and citations omitted).  As to the fourth element, special harm is the loss of something having at least indirect pecuniary value, such as the loss of society, companionship and association.  Restatement (Second) of Torts § 575 (1977).  A statement is actionable irrespective of special harm if the communication is libel.  In that case, no further proof of injury or loss is required to recover general damages.  Id. § 569.  General damages includes compensation for "impairment of reputation and standing in the community," and "personal humiliation, and mental anguish and suffering."  Id. § 621.

Thus, the interest protected by defamation actions is that of reputation.  Gonsalves, 100 Hawai'i at 171, 58 P.3d at 1218.  "In defamation actions general damages are imposed for the purpose of compensating the plaintiff for the harm that the publication has caused to his reputation."  Restatement (Second) of Torts § 621 (1977).

In comparing the physical and mental injuries clearly contemplated by the legislature in providing compensation for "personal injury" in Chapter HRS 386, and the purpose of compensation in defamation actions--to compensate for harm to reputation--we conclude that defamation and false light do not inflict a "personal injury" under HRS § 386-3.  Nowhere in HRS Chapter 386 is there any provision for compensation for harm to

28

reputation.  Defining "personal injury" under HRS § 386-3 as including injury for which HRS Chapter 386 provides no remedy is inconsistent with the WCL's purpose to provide compensation for work-related injuries.  See Nassa v. Hook-SupeRx, Inc., 790 A.2d 368, 372 (R.I. 2002) ("the scope of the exclusive-remedy doctrine as embodied in workers' compensation law depends upon whether the alleged work-related injury is one for which the applicable workers' compensation statute provides a compensation remedy.").  Interpreting the WCL to bar claims for defamation would produce an absurd result because employees would have no way in which to recover for reputational harm--they would not recover damages in tort, nor would they receive compensation for the harm to their reputation from the WCL.  Such a result is manifestly inconsistent with the WCL's purpose to compensate employees for work-related injuries.

Based on the foregoing, we hold that harm to reputation is not a "personal injury" under HRS § 386-3.[8]  Because the

---

[8]    The County argues that this court has previously defined "personal injury" to include reputational harm in TMJ Hawaiʻi, Inc. v. Nippon Trust Bank, 113 Hawaiʻi 373, 153 P.3d 444 (2007).  However, in TMJ Hawaiʻi, we defined personal injury in a different context:  the assignability of tort claims.  Id. at 374-75, 153 P.3d at 445-46.  There, we explained that "tort claims that are 'personal' in nature are not assignable."  Id. at 381, 153 P.3d at 452.  We compared malpractice, breach of fiduciary duty, and fraud claims to "personal" tort claims and held:

> These allegations consist of direct and quantifiable economic injuries to the estate or property of Ishimura Building, as opposed to physical, mental, or

(continued...)

purpose of defamation actions is to provide compensation for harm to reputation, and because a reputational injury is not a "personal injury," we hold that the torts of defamation and false light are beyond the ambit of the WCL's exclusivity provision.

The fact that damages for mental anguish and suffering may also be recovered in a defamation action does not change our conclusion. We are persuaded by the reasoning of the Supreme Judicial Court of Massachusetts, which, in holding that defamation claims were not barred by workers' compensation, noted:

> The [workers' compensation] act has been interpreted to encompass physical and mental injuries arising out of employment, whereas the gist of an action for defamation is injury to reputation, irrespective of any physical or mental harm. We recognize the conceptual problem inherent in the employee's including physical and mental injury as elements of damage in the defamation claim. However, we feel that to block the main thrust of this action because of peripheral items of damages, when a compensation claim

---

[8](...continued)
reputational harm. Given the non-personal nature of the injuries alleged, we are compelled to conclude that the professional malpractice, breach of fiduciary duty, and fraud claims presented in the present case are assignable.

Id. at 384, 153 P.3d at 455 (emphasis added).

TMJ Hawaiʻi thus categorizes torts that redress reputational harm as "personal" claims for the purposes of analyzing whether they are assignable. However, a word's meaning can vary depending on context, and our observation that reputational harm is a "personal" injury for the purposes of determining whether a claim is assignable does not compel the conclusion that defamation is a "personal injury" within the context of the WCL. Again, to interpret "personal injury" to include reputational harm is counter to the "spirit of the law, and the cause which induced the legislature to enact it" because HRS Chapter 386 provides no compensation for reputational harm. See Gurrobat v. HTH Corp., 135 Hawaiʻi 128, 133, 346 P.3d 197, 202 (2015).

> could not purport to give relief for the main wrong of injury to reputation, would be incongruous, and outside the obvious intent of the exclusiveness clause.

Foley v. Polaroid Corp., 381 Mass. 545, 551-52, 413 N.E.2d 711, 715 (1980)(citations omitted).

Our holding is consistent with the weight of authority from other jurisdictions. See, e.g., Nassa, 790 A.2d at 371 ("the prevalent view throughout the nation . . . is that the exclusive-remedy provisions of workers' compensation laws do not bar employment-related defamation claims."); Tracy Bateman Farell, Defamation, 82 Am. Jur. 2d Workers' Compensation § 73 ("Defamation actions generally are not barred by the exclusive remedy provision of workers' compensation statutes. The rationale for this exception is that an injury to an employee's reputation is not the kind of injury contemplated by a workers' compensation act[.]")

Decisions contrary to the majority view frequently involve the broad application of an exclusivity provision to an employee who alleged multiple causes of action for intentional torts, without considering whether harm to one's reputation is properly considered a "personal injury." See, e.g., Becker v. Automatic Garage Door Co., 456 N.W.2d 888 (Wis. Ct. App. 1990); Thompson v. Maimonides Med. Ctr., 86 A.D.2d 867 (N.Y. App. Div. 1982).

31

The ICA's decision in Yang similarly broadly applied the WCL exclusivity provision to an employee who alleged multiple intentional tort causes of action, without specifically considering whether reputational harm is a "personal injury." Yang, 128 Hawaiʻi at 183, 284 P.3d at 956. There, a clothing store employee alleged that she was wrongfully accused of stealing money and filed a complaint which included counts for, inter alia, false imprisonment, harassment, wrongful termination, intentional infliction of emotional distress, and defamation. Id. at 174-75, 284 P.3d at 947-48. The circuit court held that injuries caused by the intentional actions of the employer were not covered under the WCL. Id. at 175-76, 284 P.3d at 948-49. The ICA vacated the circuit court's decision, holding that HRS § 386-5 barred all of Yang's intentional tort claims. Id. at 183, 284 P.3d at 956.

Yang stands for the proposition that the WCL's exclusivity provision encompasses intentional torts, including defamation, unless otherwise provided for by the legislature. Id. However, the ICA did not explicitly consider the application of the exclusivity provision to reputational injuries. The ICA failed to recognize that by barring defamation claims, it left employees without a remedy for harm to their reputation caused by their employers--a result inconsistent with the purpose of the

32

WCL.  Because we conclude that the legislature did not intend to include reputational injuries in the definition of "personal injury" in HRS § 386-3, we overrule Yang to the extent it held that defamation claims were barred by the WCL.

In conclusion, reputational harm is not a "personal injury" under HRS § 386-3.  Because the purpose of defamation and false light claims is to provide compensation for reputational harm, defamation and false light claims are not covered by the WCL exclusivity provision, HRS § 386-5.

**B.   Summary Judgment as to the Truth of Yagong's and Kawauchi's Statements**

Having held that Petitioners' claims were not barred by the WCL, we turn to whether there was a disputed question of material fact as to the truth of the allegedly defamatory statements.  The circuit court granted summary judgment in favor of Kawauchi and Yagong based on its finding that there was an absence of evidence that they made false statements, and the ICA affirmed.  Petitioners argue that the ICA erred in affirming summary judgment.  We conclude that Yagong did not meet his burden to establish that there was no dispute of material fact that his statements were true, and accordingly, vacate summary judgment in his favor.  However, we affirm the entry of summary judgment in favor of Kawauchi.

33

"The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts." Ralston v. Yim, 129 Hawaiʻi 46, 56, 292 P.3d 1276, 1286 (2013). "In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Kawashima v. State, 140 Hawaiʻi 139, 148, 398 P.3d 728, 737 (2017). The court must "view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion." Ralston, 129 Hawaiʻi at 56, 292 P.3d at 1286.

Petitioners' defamation and false light claims against Kawauchi and Yagong are based on the January 12, 2012, Hawaiʻi Tribune Herald article entitled, "County elections workers fired.[9]" The article stated, in relevant part:

---

[9] In their complaint, Petitioners also identify statements made by an anonymous blogger with the pseudonym "Taxedtodeath," and contended that Kawauchi and Yagong "leaked false and misleading information to the media" because the blogger "specifically referred to details only contained in Defendant CSII's investigation which had not been released to the public." However, Petitioners do not mention the anonymous blogger, and identify only the statements in the January 12, 2012 article as forming the basis of their defamation claim, in their opposition to Kawauchi and Yagong's motion for summary judgment. Because we find that there is a disputed question of material fact as to the truth of the statements in the January 12, 2012 article, we do not address Petitioners' allegations regarding the blogger's statements.

> Hawaii County has fired four elections workers, including the program administrator, <u>following an investigation into alcohol storage and private business activities</u> allegedly conducted at a Hilo elections warehouse.
>
> <u>"They have received termination notices already,"</u> County Council Chairman Dominic Yagong said of three letters dated Friday
>
> A separate notice had been sent earlier to another employee, whose termination appeal is now at the arbitration level, he said.
>
> <u>The infractions dealt with "violations of county policy,"</u> the Hamakua councilman said Wednesday.
>
> "I don't want to go into details and jeopardize the process," Yagong said when asked for specific reasons for the discharges.
>
> Last July 7, Yagong and County Clerk Jamae Kawauchi visited the roughly 2,000-square-foot warehouse the county rents at Makaala St. Concerned with what he saw, Yagong ordered the locks changed that night and that an independent investigation be conducted.
>
> "The warehouse remains closed as the Police Department is continuing its investigation," Yagong said Wednesday.
>
> However, it's still being used as a storage facility for election ballot boxes, he said.
>
> "The final decision (to terminate the employees) is made by the county clerk, but I was involved in the decision-making process," Yagong said.
>
> <u>Kawauchi confirmed four employees have "separated"</u> from the county, but she couldn't divulge why.
>
> However, she identified the employees as: Pat Nakamoto, a longtime elections program administrator; Glen Shikuma, warehouse manager; Shyla Ayau; and Elton Nakagawa.

(Emphases added).

Viewing the evidence in the light most favorable to Petitioners, we find that Yagong did not demonstrate an absence of any genuine issue as to all material facts, namely, whether

35

the statements attributed to him in the January 12, 2012 Hawai'i Tribune Herald article were true. Ralston, 129 Hawai'i at 56, 292 P.3d at 1286. Although truth is an absolute defense to defamation claims, this court has held that "substantial truth" is a matter for the jury to decide. Kohn v. W. Hawai'i Today, Inc., 65 Haw. 584, 590, 656 P.2d 79, 84 (1982) ("The question, a factual one, is whether there is a substantial difference between the allegedly libelous statement and the truth; or stated differently, whether the statement produces a different effect upon the reader than that which would be produced by the literal truth of the matter.").[10]

A reasonable juror could find that Yagong's statements indicated that all of the terminated employees in fact violated County policy relating to alcohol at the warehouse and were involved in conducting private business activities out of the warehouse. The article states, "Hawai'i County has fired four election workers . . . following an investigation into alcohol storage and private business activities allegedly conducted at a

---

[10] In Kohn, the defendant newspaper published an article mentioning plaintiff as one of several businesses at which dangerous drugs, including heroin, cocaine, hashish, and morphine, were confiscated. Id. at 585, 656 P.2d at 80. The plaintiff sued for defamation because the police had confiscated only marijuana from the plaintiff. Id. This court affirmed the trial court's denial of defendant's motion for summary judgment, holding, "A jury is especially suited to make the factual determination of whether the average reader would have been affected by the article in a far different manner than if the article had been accurately written." Id. at 590, 656 P.2d at 84.

36

Hilo elections warehouse." The article quotes Yagong as stating that the employees "have received termination notices" and that the infractions dealt with "violations of county policy."[11]

Although there is no dispute of fact that Kawauchi sent Petitioners termination letters a few days before the article was published, we conclude that there is a dispute of material fact as to whether Petitioners committed violations of County policy. As Petitioners argue, despite the alleged violations of County policy, Petitioners were reinstated. Moreover, the County's Human Resources Director testified that he told Kawauchi and Yagong that there was not enough evidence in CSII's reports to terminate Nakamoto.[12] Further, although the article implied that Petitioners were involved in private business activities at the warehouse, Kawauchi and Yagong have not pointed to any evidence that Petitioners themselves conducted such activities at the

---

[11]    Although it was the newspaper who printed Yagong's and Kawauchi's statements, and thus the newspaper's wording of the article might contribute to the effect of Yagong's and Kawauchi's statements on the reader, Yagong is directly quoted as saying that the infractions "dealt with violations of County policy." In his deposition, Yagong confirmed that he interviewed with Jason Armstrong for the January 12, 2012 Hawaiʻi Tribune Herald article. Yagong testified that he did not recall whether Jason Armstrong sent him a preview of the article before it was published.

[12]    Although Kawauchi and Yagong argued they did not have a duty to act based on the Human Resources Director's opinion, we conclude that Takahashi's opinion, together with the fact of reinstatement, raises a question of fact as to whether Petitioners violated County policy. As to Kawauchi and Yagong's argument that Takahashi had a conflict of interest regarding the investigation, Kawauchi and Yagong cited only a newspaper article; they did not ask Takahashi about any such conflict during his deposition. Further, the alleged conflict was only as to Shikuma, not as to Petitioners.

warehouse.  Finally, although Kawauchi and Yagong argued that they relied on information in CSII's reports in deciding to terminate Petitioners, Petitioners disputed the reliability of the results of the investigation, contending that CSII did not interview critical witnesses, including, inter alia, Akiyama, the owner of the elections warehouse, and former County Clerks Goodenow and Leigh.

Based on the foregoing, we conclude that Petitioners raised a genuine issue of material fact, and that accordingly the circuit court erred in granting summary judgment in favor of Yagong on the defamation and false light claims.[13]  We therefore vacate the circuit court's judgment in favor of Yagong, and remand for further proceedings.  However, we affirm the grant of summary judgment in favor of Kawauchi.  Kawauchi was quoted in the January 12, 2012 article as saying that four individuals, including Petitioners, had "separated" from the County, but declined to give additional details.  Kawauchi's statement was limited to confirming a fact that was objectively correct and did not itself imply misconduct.  It is undisputed that Kawauchi's statement was true, and she is accordingly entitled to summary

---

[13]   Petitioners did not raise their negligent investigation claims or negligent infliction of emotional distress claims against Kawauchi and Yagong in their individual capacities in the ICA.  Accordingly, these claims are waived, and we do not address them.

judgment.

Because we vacate the circuit court's grant of summary judgment in favor of Yagong in his individual capacity, we also vacate the circuit court's dismissal of Petitioners' claims against the County and Yagong in his official capacity. The ICA affirmed the circuit court's grant of summary judgment in favor of Kawauchi and Yagong, holding that the undisputed facts established that Kawauchi and Yagong did not make false statements. The ICA determined that, although post-employment defamation claims were not barred by the WCL, the law of the case doctrine barred Petitioners from reasserting their defamation and false light claims against the County and against Kawauchi and Yagong in their official capacity, because the claims were based on the same statements. Since we are vacating the grant of summary judgment as to Yagong in his individual capacity, the law of the case doctrine would not apply. Accordingly, Petitioners may reassert their defamation and false light claims against the County and Yagong in his official capacity, based on our holding that the claims were not barred by the WCL. We therefore vacate the circuit court's grant of the County's motion to those claims, and remand for further proceedings.[14]

---

[14] Petitioners did not raise their negligent investigation claims or negligent infliction of emotional distress claims against the County or

(continued...)

**C.    Licensed Private Investigators Owe a Duty of Care to the Subject of Their Investigations.**

Petitioners argue that the ICA erred in concluding that CSII owed no legal duty to Petitioners that would support their negligent investigation claim against CSII.  CSII argues that it did not owe a legal duty to Petitioners because it was not their employer, and it was not responsible for decisions relating to their employment.

A negligent investigation claim is a common law tort action for negligence.  One element of such an action is "[a] duty or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks."  Tseu ex rel. Hobbs v. Jeyte, 88 Hawaiʻi 85, 91, 962 P.2d 344, 350 (1998).

"[A] duty of care may be established by statute if a 'legislative enactment [ ] lays down requirements of conduct, and provides expressly or by implication that a violation shall entail civil liability in tort.'"  Arquette v. State, 128 Hawaiʻi 423, 443, 290 P.3d 493, 513 (2012) (citing Lee v. Corregedore, 83 Hawaiʻi 154, 172, 925 P.2d 324, 342 (1996)).  We hold, based on our precedent and case law from other jurisdictions, that a

---

[14](...continued)
Kawauchi and Yagong in their official capacities in the ICA.  Accordingly, those claims are waived, and we do not address them.

statute and regulation pertaining to CSII's status as a licensed private investigator create a legal duty of care owed by CSII to the subjects of its investigations.[15]

In Arquette, a plaintiff subject to an investigation by the Office of Consumer Protection (OCP) brought a negligent investigation claim against OCP, arguing that HRS § 487-1[16] created a duty of care in OCP to the subjects of its investigations.  In considering the plaintiff's contention, this court relied on its previous decision in Corregedore, which held:

> Duty in a negligence action may be defined by common law or by statute. . . .  "[w]hen a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard ... from which it is negligence to deviate."  William L. Prosser, Prosser & Keeton on the Law of Torts § 36 at 220 (5th ed. 1984) (footnote omitted).  Thus, the key words are that the statute must specify or imply standards or "requirements of conduct" that will create civil liability.
>
> . . . .

---

[15]    Because we hold that CSII owed a duty as a licensed private investigator, we do not address Petitioners' argument that various public employment statutes created a legal duty of care.

[16]    HRS § 487-1 (1984) provides:

The public health, welfare and interest require a strong and effective consumer protection program to protect the interests of both the consumer public and the legitimate business person. Toward this end, a permanent office of consumer protection is created to coordinate the services offered to the consumer by various state and county agencies, together with private organizations, and to aid in the development of preventive and remedial programs affecting the interest of the consumer public.

> If a statute "contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence." Restatement (Second) of Torts § 285 comment c (1965). Courts may adopt the requirements of a statute as the standard of care when the purpose of the statute is to "protect a class of persons which includes the one whose interest is invaded[.]" Restatement (Second) of Torts § 286(a) (1965).

83 Hawaiʻi at 172-73, 925 P.2d at 342-43 (emphasis added).

We held in Arquette that HRS § 487-1 did not create a duty of care. 128 Hawaiʻi at 443, 290 P.3d at 513. HRS § 487-1 creates a permanent office of consumer protection to coordinate services and programs affecting the consumer public. We held that the statute did not obligate government officials to "act in a certain manner or in accordance with any particular standard or proscribe any conduct," and, accordingly, did not create or indicate a duty of care which could form the basis of the plaintiff's negligence action. Arquette, 128 Hawaiʻi at 443, 290 P.3d at 513.

Similarly, in Corregedore, we held that HRS Chapter 363, "Veterans Rights and Benefits," did not create a statutory duty of care on the part of Veterans' Services Counselors. 83 Hawaiʻi at 173, 925 P.2d at 343. The statutes required that the Office of Veterans' Services, inter alia, maintain and supervise a center for veterans, their families and dependents providing information and referral for services, assistance, or benefits;

42

cooperate with other agencies in the community to coordinate available services; and assemble, analyze, compile, and disseminate factual up-to-date information with respect to available benefits.  Id.  We held that the statute did not proscribe conduct nor specify standards of conduct for Veterans' Services Counselors, nor could such standards of conduct be inferred from the chapter's language.  Id.

Cases outside Hawaiʻi, applying the principle that statutes may create a duty of care, have held that a licensed private investigator owes a duty to the subjects of its investigations, based on the state's licensing statute.  See Cruz v. Viewpoint CRM, Inc., No. CV-126014149, 2013 WL 593886, at \*12 (Conn. Super. Ct. Jan. 16, 2013); Devlin v. Greiner, 147 N.J. Super. 446, 466, 371 A.2d 380, 391 (Law. Div. 1977).

In Devlin, a husband hired a licensed detective to investigate whether his wife was having an affair with plaintiff, Devlin.  147 N.J. Super. at 452, 371 A.2d at 383.  The investigator reported on the affair, and the husband filed for divorce.  Id.  Devlin and the wife sued the investigator based on, inter alia, a claim of negligence.  Id.  The investigator argued that he owed no duty to plaintiffs.  Id. at 465, 371 A.2d at 391.  The court disagreed, holding:

> Defendant clearly had a duty to those he observed to report accurately on their activities.  He is a

43

> private detective, licensed under N.J.S.A. 45:19-12.
> It is his business, among other things, to supply his
> clients with information or factual data concerning
> the activities of others.  Where the information
> gathered by him is of a delicate or sensitive nature,
> his duty to report that information accurately should
> extend not only to the person who hired him, but also
> to the subjects of his surveillance-people whose lives
> may be materially affected by the accuracy of his
> reports.
>
> . . . .
>
> This duty to report information accurately springs
> from a second source, in addition to the traditional
> principles of negligence.  In procuring a license to
> be a private detective, defendant holds himself out to
> be a person of good character, competency and
> integrity.  N.J.S.A. 45:19-12; Schulman v. Kelly, 54
> N.J. 364, 255 A.2d 250 (1969).  The requirements of
> the statute evince a legislative recognition of the
> potential for abuse inherent in defendant's business.
> The Legislature thus exercised control, in the
> societal interest, over the people upon whom it
> conferred the powers enumerated in N.J.S.A. 45:19-9.
> The entire tenor of licensing statute indicates that
> its aim is to impose a standard of competent
> professionalism upon licensed private detectives.

Id. at 466-67, 371 A.2d at 391.

In Cruz, a licensed surveillance company hired by an apartment complex reported that the employee of a janitorial company contracted by the apartment complex had used drugs, and the janitorial company terminated its employee.  Cruz, 2013 WL 593886 at *1.  The court held that the surveillance company owed a duty to the terminated janitorial employee:

> by obtaining the statutorily mandated professional
> license, a defendant holds itself and its
> investigators out to the public as possessing the good
> character, competency and integrity to properly
> conduct its investigative activities, including
> surveillance, and to submit true and accurate reports
> of those activities.  This court finds that this
> legislatively imposed duty, obligating the defendant

44

> to report its observations accurately, should not only
> inure to the benefit of the one who hired the
> defendant but should extend to persons, such as the
> plaintiffs, who were made subjects of the surveillance
> and whose lives were materially and adversely affected
> by the defendant's allegedly false report of their
> activities.

Id. at *12.

The court's holding was based on Connecticut's statute for application for a license as a private detective, which provides, "[u]pon being satisfied, after investigation, of the good character, competency and integrity of the applicant, or, if the applicant is an association or partnership, of the individual members thereof . . . the conimissioner [sic] [of Public Safety] may grant a license to conduct such private detective business[.]" Id. at *11 (quoting Conn. Gen. Stat. Ann. § 29-155).

Hawaiʻi has a private investigator licensing statute similar to that of Connecticut. Under HRS § 463-1 (Supp. 2010), "'Detective', 'private detective', or 'investigator' means a licensed person qualified to obtain information and evidence not readily or publicly accessible." Pursuant to HRS § 463-6 (Supp. 2004):

> (a) The board [of private detectives and guards] may
> grant a private detective license to any suitable
> individual, or a detective agency license to any
> suitable firm making written application therefor.
> The applicant, if an individual, or the principal
> detective of a firm shall:
>
> . . .

45

> (6) Possess a history of honesty, truthfulness,
> financial integrity, and fair dealing.

Further, Hawaiʻi Administrative Rules (HAR) § 16-97-46 provides that a license may be terminated for, inter alia, "misrepresenting a material fact, on any investigative, surveillance, or security report[.]"

We hold that the statute and regulation governing licensing for private investigators, HRS § 463-6 and HAR § 16-97-46, create a duty of care owed by the licensed investigator to the subjects of its investigation. By requiring that the licensed investigator possess a history of "honesty," "integrity," and "fair dealing" and providing for termination of a license for the misrepresentation of a fact, HRS § 463-6 and HAR § 16-97-46 "imply standards or requirements of conduct that will create civil liability." See Corregedore, 83 Hawaiʻi at 172, 925 P.2d at 342 (citations omitted). Even if the statute did not imply a standard which would create liability, we choose to "adopt the requirements of [the] statute as the standard of care [because] the purpose of the statute is to protect a class of persons which includes the one whose interest is invaded." See id. at 173, 925 P.2d at 343. The "requirements of the statute [and regulation] evince a legislative recognition of the potential for abuse inherent" in an investigator's business and

46

the "tenor of licensing statute indicates that its aim is to impose a standard of competent professionalism upon licensed private detectives."  See Devlin, 147 N.J. Super. at 467, 371 A.2d at 391.  The private investigator's "legislatively imposed duty, obligating [CSII] to report its observations accurately, . . . should extend to persons, such as [Petitioners], who were made subjects of the surveillance and whose lives were materially and adversely affected by the defendant's allegedly false report of their activities."  See Cruz, 2013 WL 5993886 at \*12.

Kevin D. Antony, owner of CSII, is a licensed private investigator.  Accordingly, CSII owed a duty of care to Petitioners to conduct an investigation honestly, truthfully, with fair dealing, and to report the results of the investigation accurately, without misrepresenting any facts.  See HRS § 463-6; HAR § 16-97-46.  We therefore vacate the circuit court's grant of summary judgment in favor of CSII on the negligent investigation claim, and remand for a determination as to whether CSII breached its duty of care.[17]

## V.  Conclusion

For the foregoing reasons, we conclude that the circuit court erred in dismissing Petitioners' claims against the County,

---

[17]     As to CSII, Petitioners raised only the negligent investigation claim in the ICA and before this court.  Accordingly, their other claims against CSII are waived before this court, and we do not address them.

47

erred in granting summary judgment in favor of Yagong, and erred in granting summary judgment in favor of CSII.  We therefore vacate the ICA's May 9, 2017 judgment, the circuit court's October 3, 2013 judgment as to all defendants except Kawauchi, the circuit court's March 8, 2013 order granting the County's motion to dismiss, the circuit court's June 25, 2013 sua sponte amended order granting summary judgment in favor of Yagong, and the circuit court's June 4, 2013 order granting summary judgment in favor of CSII, and remand the case for further proceedings consistent with this opinion.

Ted H.S. Hong
for petitioner

Laureen L. Martin
for respondents County of
Hawaiʻi, and Jamae Kawauchi
and Dominic Yagong, in their
official capacities

Jill D. Rasnov
for respondents Jamae Kawauchi
and Dominic Yagong, in their
individual capacities

Jodie D. Roeca
for respondent Corporate
Specialized Intelligence and
Investigations, LLC

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

